**[ORAL ARGUMENT NOT SCHEDULED]**

**Nos. 26-7049, 26-7052, 26-7123, 26-7154**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

BARBARA J. LEE, *et al.*,
Plaintiffs-Appellees,

v.

DONALD J. TRUMP, solely in his personal capacity, *et al.*,

Defendants-Appellants

UNITED STATES OF AMERICA,

Movant-Appellant

On Appeal from the United States District Court for the District of Columbia

# OPENING BRIEF FOR UNITED STATES & AMICUS BRIEF IN SUPPORT OF PRESIDENT TRUMP'S OPENING BRIEF

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
BRAD HINSHELWOOD
LAURA E. MYRON
*Attorneys, Appellate Staff*
*Civil Division, Room 7228*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

---

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties and Amici

This appeal arises from eight consolidated cases. *See Lee v. Trump*, No. 21-cv-400 (D.D.C.); *Swalwell v. Trump*, No. 21-cv-586 (D.D.C.); *Blassingame v. Trump*, No. 21-cv-858 (D.D.C.); *Smith v. Trump*, No. 21-cv-2265 (D.D.C.); *Moore v. Trump*, No. 22-cv-10 (D.D.C.); *Tabron v. Trump*, No. 22-cv-11 (D.D.C.); *Kirkland v. Trump*, No. 22-cv-34 (D.D.C.); *Garza v. Trump*, No. 23-cv-38 (D.D.C.). Plaintiffs in district court, and appellees in the consolidated cases, are Bonnie Watson Coleman, Pramila Jayapal, Maxine Waters, Jerrold Nadler, Henry C. Johnson, Stephen I. Cohen, Barbara J. Lee, Veronica Escobar, Marcia Kaptur, Governor Latson, Danny McElroy, Melissa Marshall, Michael Fortune, Jason Deroche, Reginald Cleveland, Byron Evans, Conrad Smith, James Blassingame, Sidney Hemby, Marcus J. Moore, Bobby Tabron, Dedivine K. Carter, Briana Kirkland, Eric Swalwell, Sandra Garza. Bennie G. Thompson and Karen R. Bass were plaintiffs in district court but are no longer parties to the cases.

The defendants in the consolidated cases are Donald J. Trump, solely in his personal capacity, Proud Boys International, LLC, Zachary Rehl, Warboys LLC, Enrique Tarrio, Joseph R. Biggs, Ethan Nordean, Felipe Antonio Martinez Tony, Derek Kinnison, Stop the Steal LLC, Ali Alexander, Charles Donohoe, Dominic J. Pezzola, Oath Keepers, Stewart Rhodes, Thomas E. Caldwell, Jessica Watkins, Kelly Meggs, Erik Scott Warner, and Russell Taylor. Rudolph W. Guiliani, Mo Brooks, Representative, in his personal capacity, Brandon J. Straka, Roger J. Stone Jr., George Pierre Tanios, Alan Hostetter, Ronald Mele, and Julian Elie Khater were parties in district court but are no longer parties to the cases.

In seven of the consolidated cases, the United States of America filed a notice of substitution under the Westfall Act, 28 U.S.C. § 2679(d), substituting the government as defendant for Donald J. Trump, solely in his personal capacity, with respect to plaintiffs' common-law tort claims.

Amici curiae and putative amici curiae include Daniel J. Scavino Jr., Evan H. Caminker, Andrew Kent, Sheldon Nahmod, Daphna Renan, Peter M. Shane, Erwin Chemerinsky, Martha Minow, Laurence

H. Tribe, Floyd Abrams, Jared Holt, Campaign Legal Center Action, and Reconstruction Era Scholars. Non-party respondents in district court include Event Strategies Incorporated, Megan Powers, Office of the General Counsel for the House of Representatives.

### B. Rulings Under Review

The rulings under review are the opinion and order entered in the consolidated cases on March 31, 2026. *See Lee v. Trump*, No. 21-cv-400 2026 WL 880161 (D.D.C. Mar. 31, 2026) (Mehta, J.).

### C. Related Cases

The cases on review have previously been before this Court in appeals numbered 22-5069, 22-7030, 22-7031, and consolidated cases. The undersigned counsel is unaware of any related cases currently pending in any court other than the eight consolidated cases.

*/s/ Laura E. Myron*
Laura E. Myron

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 5

STATEMENT OF THE ISSUES ........ 6

STATEMENT OF THE CASE ........ 7

A. Statutory Background ........ 7

B. Factual Background ........ 9

C. Prior Proceedings ........ 10

1. This Court's *Blassingame* Decision ........ 10

2. The District Court's Decision on Remand ........ 12

SUMMARY OF ARGUMENT ........ 15

STANDARD OF REVIEW ........ 22

ARGUMENT ........ 22

I. The President Is Entitled To Immunity Under The Westfall Act ........ 22

A. The District Court Wrongly Treated Westfall Act Immunity As Co-Extensive With Official-Acts Immunity ........ 24

B. The President Acted Within The Scope Of His Employment ........ 32

1. Nature of the Conduct ........ 32

2. Authorized Time and Space Limits ........ 40

3. Purpose to Serve the Employer ........ 41

II. The President Was Entitled To *Nixon* Official-Acts Immunity ........ 42

CONCLUSION ........ 54

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Blassingame v. Trump*,
87 F.4th 1 (D.C. Cir. 2023) .......................... 4, 10, 11, 12, 13, 14, 20, 21, 25, 30, 40, 45, 46, 50, 51, 54

*Carroll v. Trump*,
49 F.4th 759 (2d Cir. 2022) .......................... 7, 31

*Clinton v. Jones*,
520 U.S. 681 (1997) .......................... 10

*Council on Am. Islamic Rels. v. Ballenger*,
444 F.3d 659 (D.C. Cir. 2006) .......................... 17, 24, 26, 33

*Doe v. Meron*,
929 F.3d 153 (4th Cir. 2019) .......................... 26

*Does 1-10 v. Haaland*,
973 F.3d 591 (6th Cir. 2020) .......................... 43

*Gutierrez de Martinez v. Drug Enf't Admin.*,
111 F.3d 1148 (4th Cir. 1997) .......................... 26

*Gutierrez de Martinez v. Lamagno*,
515 U.S. 417 (1995) .......................... 24

*Harbury v. Hayden*,
522 F.3d 413 (D.C. Cir. 2008) .......................... 28, 29

*Howard Univ. v. Best*,
484 A.2d 958 (D.C. 1984) .......................... 29

*Jacobs v. Vrobel*,
724 F.3d 217 (D.C. Cir. 2013) .......................... 26, 28, 39

*Jamison v. Wiley*,
14 F.3d 222 (4th Cir. 1994) .......................... 31

*Johnson v. Weinberg*,
434 A.2d 404 (D.C. 1981) .......................... 29

*Kimbro v. Velten*,
30 F.3d 1501 (D.C. Cir. 1994) ........................................................ 26

*Lyon v. Carey*,
533 F.2d 649 (D.C. Cir. 1976) ........................................................ 30

*Melo v. Hafer*,
13 F.3d 736 (3d Cir. 1994) ........................................................ 26

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ........................................ 2, 7, 10, 16, 22, 27, 30, 52

*Osborn v. Haley*,
549 U.S. 225 (2007) ........................................................ 2, 6, 7

*Penn Cent. Transp. Co. v. Reddick*,
398 A.2d 27 (D.C. 1979) ........................................................ 29

*Rasul v. Myers*,
512 F.3d 644 (D.C. Cir. 2008),
*vacated and remanded on other grounds*,
555 U.S. 1083 (2008),
*reinstated in relevant part per curiam by*
563 F.3d 527 (D.C. Cir. 2009) ........................................................ 34

*Saleh v. Bush*,
848 F.3d 880 (9th Cir. 2017) ........................................................ 26

*Schneider v. Kissinger*,
310 F. Supp. 2d 251 (D.D.C. 2004) ................................................ 39

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ........................................................ 1

*Trump v. Carroll*,
292 A.3d 220 (D.C. 2023) ..................... 8, 16, 17, 18, 24, 25, 28, 29, 30,
31, 32, 33, 36, 39, 40, 41, 42

*Trump v. Hawaii*,
585 U.S. 667 (2018) ........................................................ 36, 38

*Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020) ........................................................ 36

*Trump v. United States*,
603 U.S. 593 (2024) ................................ 1, 35, 36, 38, 45, 46, 50, 50-51

*Wilson v. Libby*,
535 F.3d 697 (D.C. Cir. 2008) ........................................ 19, 26, 34, 41

*Wuterich v. Murtha*,
562 F.3d 375 (D.C. Cir. 2009) ................................ 8, 22, 24, 33, 34, 43

**U.S. Constitution:**

Art. II, § 3 (Recommendation Clause) ................................................ 49

**Statutes:**

28 U.S.C. § 1291 ........................................................................... 6

28 U.S.C. § 1331 ........................................................................... 5

28 U.S.C. § 1332(a)(1) ................................................................... 5

28 U.S.C. § 1343 ........................................................................... 6

28 U.S.C. § 1367 ........................................................................... 5

28 U.S.C. § 2679(b) ........................................................................ 7

28 U.S.C. § 2679(b)(1) .................................................................... 2

28 U.S.C. § 2679(d) ..................................................................... 6, 7

28 U.S.C. § 2679(d)(1) .................................................................. 44

42 U.S.C. § 1985(1) ........................................................................ 9

**Regulatory Materials:**

Exec. Order No. 13,799,
82 Fed. Reg. 22389 (May 16, 2017) ................................................... 43

Exec. Order No. 14,248,
90 Fed. Reg. 14005 (Mar. 28, 2025) ........ 43

**Other Authority:**

Restatement (Second) of Agency (A.L.I. 1958),
Westlaw (database updated Oct. 2024) ........ 8, 24, 29, 32, 33, 41

## GLOSSARY

| | |
|---|---|
| CIA | Central Intelligence Agency |
| Westfall Act | Federal Employees Liability Reform and Tort Compensation Act of 1988 |

## INTRODUCTION

Plaintiffs in these eight consolidated cases seek to hold the President of the United States personally liable for the events of January 6, 2021. Although their legal theories vary, plaintiffs focus on the President's public statements following the November 2020 election and, in particular, on his speech at a rally on the Ellipse on January 6.

These are extraordinary claims and allowing them to proceed to trial would have enormous practical consequences for the Presidency. No President in the history of our Nation has been held personally liable for his speech to the public on a matter of public concern, and for good reason. As the Supreme Court recently emphasized, it is among the President's most important functions in our government to "us[e] the office's 'bully pulpit' to persuade Americans, including by speaking forcefully or critically, in ways that the President believes would advance the public interest." *Trump v. United States*, 603 U.S. 593, 629 (2024). Plaintiffs may blame the President's speech for the events of January 6, but little could be more dangerous to the Framers' vision of a vigorous and energetic Chief Executive accountable to the people in regular elections, *Seila Law LLC v. CFPB*, 591 U.S. 197, 223 (2020),

than a rule of law that required a President to risk ruinous personal liability for his speech to the public on controversial matters of public concern—including, as here, the integrity of a Presidential election.

Two overlapping forms of absolute immunity under federal law shield President Trump from plaintiffs' claims. First, under the Constitution, the President has "absolute immunity from damages liability predicated on his official acts." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982). Second, under the Federal Employees Liability Reform and Tort Compensation Act of 1988 (Westfall Act), all federal employees, including the President, have "absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007); *see* 28 U.S.C. § 2679(b)(1).

In the order on appeal, the district court denied both forms of absolute immunity. The court first denied the President's motion for summary judgment on official-act immunity under *Nixon*. (The President, through private counsel, has separately appealed this order in No. 26-7049.) Then, relying on its *Nixon* analysis, the court summarily granted plaintiffs' motion to strike the United States'

certification under the Westfall Act, declaring that it was "hard to discern any daylight" between the *Nixon* official-acts inquiry and the scope-of-employment inquiry under the District of Columbia's law of *respondeat superior*. JA__ [Dkt. 219, at 73].[1]

The district court's order striking the Westfall Act certification should be reversed. At the Ellipse, with the White House visible behind him, the President gave a televised address about the integrity of the 2020 presidential election and the need for Congress to enact various federal legislative reforms. That speech was undoubtedly within the President's scope of employment as President under D.C. *respondeat superior* law. Giving such speeches, including at private events, is the type of act that Presidents regularly perform. The Ellipse speech was easily within the authorized time and place for the work of the President. And the content of the speech itself makes clear that the President was actuated, to at least some degree, by a desire to serve the United States and the American people. It makes no difference that the President also had personal motivations for his speech, as this Court's

[1] Referenced record materials are from the district court's docket in *Lee v. Trump*, No. 21-cv-400 (D.D.C.) unless otherwise noted.

many decisions applying D.C. *respondeat superior* law to the actions of senior government officials illustrate.

Separately, as *amicus curiae*, the United States urges the Court to reverse the district court's order denying the President's motion for summary judgment on *Nixon* official-acts immunity. The district court believed this Court's prior decision in *Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023), required it to sort the President's conduct, in binary fashion, into either "office-seeker" or "office-holder" categories. But as this Court explained, sometimes it is not reasonably possible to classify Presidential activities as one or the other. In those circumstances, a court must give the President the benefit of the ambiguity and hold him immune from personal damages liability.

On the record before it, the district court erred in holding that the Ellipse speech was so "manifestly or palpably beyond" the outer limits of the President's Office, *Blassingame*, 87 F.4th at 13 (quotation omitted), as to require the conclusion that it was private and unprotected. In fact, as the court acknowledged, one of plaintiffs' key allegations—that the President's reelection campaign organized and funded the Ellipse event—turned out to be substantially false. That

fact, coupled with the contents of the President's speech, which concerned the integrity of a Presidential election and featured legislative proposals and other matters of undisputed national public concern, makes it impossible to say that the event was so utterly unlike most Presidential speeches as to make it "manifestly" outside the President's official responsibilities. Furthermore, the district court's unwillingness to assign any weight at all to those portions of the speech—implicitly treating them as camouflage for the President's "true" partisan political purposes—suggests that the court impermissibly allowed speculation about the President's motivation to color its immunity analysis. Because the record before the district court could not support the conclusion that the Ellipse speech was "manifestly or palpably" personal and unprotected, the President was absolutely immune and entitled to summary judgment under *Nixon*.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1332(a)(1)), and 1367. *See* JA__ [*Lee v. Trump*, No. 21-cv-400, Dkt. 11-1, at 3 (D.D.C.)]; JA__ [*Swalwell v. Trump*, No. 21-cv-586, Dkt. 1, at 6 (D.D.C.)]; JA__ [*Blassingame v. Trump*, No. 21-cv-858, Dkt. 3, at

1-2 (D.D.C.)]; JA__ [*Smith v. Trump*, No. 21-cv-2265, Dkt. 89, at 15 (D.D.C.) (also invoking 28 U.S.C. § 1343)]; JA__ [*Moore v. Trump*, No. 22-cv-10, Dkt. 1, at 2 (D.D.C.)]; JA__ [*Tabron v. Trump*, No. 22-cv-11, Dkt. 1, at 2 (D.D.C.)]; JA__ [*Kirkland v. Trump*, No. 22-cv-34, Dkt. 1, at 2 (D.D.C.)]; JA__ [*Garza v. Trump*, No. 23-cv-38, Dkt. 35, at 5 (D.D.C.)]. As to Plaintiffs' common-law tort claims asserted against President Trump, the United States sought to substitute itself for the President as defendant pursuant to 28 U.S.C. § 2679(d) in all but one of the consolidated cases. *See, e.g.*, JA__ [Dkt. 74, *Blassingame*, No. 21-cv-858 (D.D.C.)]. The district court issued its opinion denying the substitution on March 31, 2026. *See* JA__ [Dkt. 219]. The United States filed its notice of appeal on April 21, 2026. *See* JA__ [Dkt. 92, *Blassingame*, No. 21-cv-858 (D.D.C.)]. This Court has jurisdiction to review the denial of the substitution under 28 U.S.C. § 1291. *See Osborn v. Haley*, 549 U.S. 225, 238 (2007).

## STATEMENT OF THE ISSUES

The government's appeal presents the following question: whether the district court erred when it struck the United States' Westfall Act certification.

In addition, as *amicus curiae*, the United States addresses the following question: whether the district court erred when it concluded that plaintiffs' claims against the President may proceed to trial notwithstanding *Nixon v. Fitzgerald*, 457 U.S. 731 (1982).

## STATEMENT OF THE CASE

### A. Statutory Background

Under the Westfall Act, when "any employee of the Government" is sued in his individual capacity under local tort law and the Attorney General certifies that the employee "was acting within the scope of his office or employment at the time of the incident out of which the claim arose," the action is deemed to be a suit against the United States pursuant to the Federal Tort Claims Act, and the United States is substituted as the sole defendant. 28 U.S.C. § 2679(b), (d). The purpose of the Westfall Act is to "accord[] federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007).[2]

[2] No party disputes that the President is an employee of the government for purposes of the Westfall Act. *See Carroll v. Trump*, 49 F.4th 759, 772 (2d Cir. 2022) ("[W]e hold that the President is an employee of the government under the Westfall Act.").

Under the Westfall Act, the scope-of-employment analysis is governed by the *respondeat superior* law of the place where the tort occurred. *Wuterich v. Murtha*, 562 F.3d 375, 383 (D.C. Cir. 2009). The District of Columbia "generally adheres" to the scope-of-employment test set forth in the Second Restatement of Agency. *Trump v. Carroll*, 292 A.3d 220, 228 (D.C. 2023). Under this test, an employee's conduct is within the scope of employment if:

> (a) it is of the kind [the person] is employed to perform;
>
> (b) it occurs substantially within the authorized time and space limits;
>
> (c) it is actuated, at least in part, by a purpose to serve the master, and
>
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

Restatement (Second) of Agency § 228(1) (A.L.I. 1958), Westlaw (database updated Oct. 2024). Likewise, conduct "is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Id.* § 228(2).

### B. Factual Background

In these cases, Members of Congress and U.S. Capitol Police officers have brought civil damages claims against, among other defendants, President Trump in his individual capacity. Plaintiffs allege that President Trump should be held civilly liable for conduct that violated 42 U.S.C. § 1985(1), which proscribes conspiring "to prevent, by force, intimidation, or threat," federal officers from discharging their duties or accepting or holding office. Plaintiffs have also brought several additional claims, including for various common law torts and statutory violations under District of Columbia law, arising out of the same conduct.

Plaintiffs' central theory is that President Trump and other defendants "conspired to prevent members of Congress, by force, intimidation, and threats, from discharging their duties in connection with the Certification of the Electoral College." JA__ [Dkt. 66, at 4]. Plaintiffs' allegations against President Trump focus on his public statements following the November 2020 election and, in particular, on his speech delivered on the Ellipse on January 6, 2021. JA__ [Dkt. 66, at 4]. Plaintiffs allege that President Trump's speech "incited his

supporters to commit imminent acts of violence and lawlessness at the Capitol." JA__ [Dkt. 66, at 4].

### C. Prior Proceedings

#### 1. This Court's *Blassingame* Decision

Initially, President Trump moved to dismiss, arguing that he is shielded from civil damages liability by absolute immunity under *Nixon v. Fitzgerald*, 457 U.S. 731 (1982). The district court denied that motion, and President Trump appealed. *See* JA__ [Dkt. 66].

This Court affirmed. Accepting plaintiffs' factual allegations as true, the Court reasoned, President Trump had not "demonstrated an entitlement to dismissal of the claims against him based on a President's official-act immunity." *Blassingame v. Trump*, 87 F.4th 1, 5 (D.C. Cir. 2023). Drawing on both *Nixon* and *Clinton v. Jones*, 520 U.S. 681 (1997), the Court discerned "three governing principles": (1) "the President is entitled to official immunity from civil damages liability based on actions within the 'outer perimeter' of official presidential responsibility, including discretionary acts"; (2) "the President is subject to civil damages suits based on actions taken in an unofficial, private capacity to the same extent as any private citizen"; and, (3) "the

President's actions do not fall beyond the outer perimeter of official responsibility merely because they are unlawful or taken for a forbidden purpose," *Blassingame*, 87 F.4th at 14.

Applying those principles, the Court rejected "President Trump's principal contention: that a President enjoys absolute immunity from civil damages liability whenever he speaks on matters of public concern." *Blassingame*, 87 F.4th at 14. The Court drew a sharp distinction between a President's actions as "office-*holder*" and as "office-*seeker*," holding that activities in the latter category can never qualify for official-act immunity under *Nixon*. *Id.* at 20 (emphases added); *see also id.* at 4-5. That is true, the Court reasoned, even when a President addresses the public on matters of public concern: "When a sitting President running for re-election speaks . . . in accepting his political party's nomination at the party convention, he typically speaks on matters of public concern. Yet he does so in an unofficial, private capacity as office-seeker, not an official capacity as office-holder." *Id.* at 5.

The Court thus affirmed the district court's denial of the President's motion to dismiss. *Blassingame*, 87 F.4th at 20-21. The

Court emphasized, however, that its holding was "necessarily tied to the need to assume the truth of the plaintiffs' factual allegations at this point in the proceedings." *Id.* at 5.

### 2. The District Court's Decision on Remand

On remand, the parties proceeded to discovery, and President Trump eventually moved for summary judgment on the *Nixon* immunity issue. *See* JA__ [Dkt. 219, at 2]. Separately, in early 2025, the United States filed a certification under the Westfall Act that plaintiffs' tort claims against President Trump concerned acts taken by the President within the scope of his employment as President of the United States in seven of the eight consolidated cases. *See, e.g.*, JA__ [Dkt. 74, *Blassingame*, No. 21-cv-858 (D.D.C.)] (notice of substitution). The United States thus urged that President Trump was absolutely immune from liability on plaintiffs' common-law claims and that the United States should be substituted as defendant.

On March 31, 2026, the district court issued a decision rejecting both immunity claims. JA__ [Dkt. 219]. As to *Nixon* official-act immunity, the court concluded that this Court's *Blassingame* decision established the relevant framework and required the denial of the

President's motion. The operative question at the summary judgment stage, the district court reasoned, was whether it is "'reasonable to think'—based on an undisputed set of material facts—that President Trump 'was exercising his official responsibilities as President, or was . . . instead engaging in reelection campaign activity as a presidential candidate.'" JA__ [Dkt. 219, at 16] (quoting *Blassingame*, 87 F.4th at 30). If the "record shows that the conduct 'may reasonably be understood only as re-election campaign activity, a court not only may, but must deny immunity.'" JA__ [Dkt. 219, at 16] (quoting *Blassingame*, 87 F.4th at 20-21).

Applying that framework, the district court concluded that the President's January 6 Ellipse speech was not an official act because the President's appearance "involved almost no 'trappings of an official function,'" JA__ [Dkt. 219, at 39], and the White House "played no meaningful role in organizing or planning" the event, JA__ [Dkt. 219, at 39]. The district court acknowledged that plaintiffs' original allegation that the speech was "organized and funded by Trump's campaign organization ha[d] not panned out," JA__ [Dkt. 219, at 40] (quotation marks omitted), and the campaign had only "played a modest role" in

the event, JA__ [Dkt. 219, at 37]. Nonetheless, the court reasoned, while the Ellipse speech "was not a fully baked campaign event," it nonetheless "b[ore] a far stronger resemblance to campaign re-election activity than an official event." JA__ [Dkt. 219, at 41]. The court also rejected President Trump's argument that the contents of the speech focused on matters of public concern, declaring that the content of the speech "'confirms' what the court's 'objective assessment of the context makes evident": that the speech was not "within the outer perimeter of his Presidential duties." JA__ [Dkt. 219, at 43] (quoting *Blassingame*, 87 F.4th at 22).

The district court further concluded that the President had not carried his burden to prove either that his "various communications with state and local officials, except one, were official acts entitled to immunity," or that his various tweets were entitled to immunity. *See* JA__ [Dkt. 219, at 48, 52].[3] The court concluded, however, that two tweets posted after the events at the Capitol turned violent, as well as a video made in the Rose Garden, fell within the outer perimeter of the

[3] The exception involved a meeting with Michigan state legislators in the Oval Office. JA__ [Dkt. 219, at 46-47].

President's official duties because the President was at the White House at the time, acting on advice of White House advisors, and his remarks were prepared with the assistance of White House staff. JA__ [Dkt. 219, at 54].

Then, having rejected *Nixon* official-act immunity, the district court saw no reason to pause over the government's Westfall Act certification, reasoning that it was "hard to discern any daylight" between the scope-of-employment inquiry under D.C. *respondeat superior* law and *Nixon*'s outer-perimeter test. Concluding that President Trump's conduct was "beyond the outer perimeter of his official responsibilities and, concomitantly, outside the scope of his employment," the court granted plaintiffs' motion to strike the Westfall Act certification. JA__ [Dkt. 219, at 76].

The United States appealed the order striking the Westfall Act certification. The President, in his individual capacity, has separately appealed the *Nixon* immunity ruling (No. 26-7049).

## SUMMARY OF ARGUMENT

1. The President is entitled to Westfall Act immunity. The district court erred in striking the Westfall Act certification as co-extensive with

its conclusion that the President was not entitled to official acts immunity under *Nixon v. Fitzgerald*, 457 U.S. 731 (1982). While many presidential acts are protected by both forms of immunity, the two doctrines are derived from different sources, serve different purposes, and function in different ways. The district court's application of the wrong legal standard alone is legal error worthy of reversal.

Although there is overlap between what is within the "outer perimeter" of the President's official duties for purposes of *Nixon* immunity and what is within his scope of employment for purposes of the Westfall Act, the tests are not co-extensive. The two tests are procedurally and substantively distinct. Both this Court and the D.C. Court of Appeals have emphasized that the scope-of-employment test is very expansive and includes conduct that is "of the same general nature as" or "incidental to" the conduct authorized. *Trump v. Carroll*, 292 A.3d 220, 230 (D.C. 2023). Unlike the test for official-acts immunity, courts often find that serious criminal or violent conduct can be within an employee's scope of employment. In addition, the scope of employment inquiry specifically takes account of the employee's

subjective intent, a consideration that is expressly prohibited in the test for immunity under *Nixon*.

2. Had the district court applied the correct legal standard, it would have concluded that the President's underlying conduct—*i.e.*, the speech given by the President on January 6 on the Ellipse and the tweets leading up to it—were within the scope of his employment. The nature of the conduct at issue is within the scope of employment if it is "either 'of the same general nature as' or 'incidental to' the conduct authorized." *Carroll*, 292 A.3d at 230 (emphasis and quotation omitted). This prong of the analysis focuses on the type of conduct at issue, not the alleged tortious nature of the conduct. *See Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006) (per curiam). Applying this principle, this Court has repeatedly held that high-ranking officials and political office holders are engaged in authorized conduct when speaking to the press or the public.

Contrary to the district court's holding, it makes no difference whether the speech was at an event organized by a private organization or that some of his challenged remarks were made by tweet. The President is not required to confine his official remarks or policy

recommendations to the White House press room or the Oval Office. Here, had it applied the test correctly, the district court should have found that the President's speech on the Ellipse, which addressed issues of significant federal concern, including the fairness and integrity of federal elections, was within the scope of his employment. For purposes of *respondeat superior*, the court's job is not to evaluate the character of the statements in question for accuracy, reasonableness, or wisdom; it is to focus on whether the type of act—here a publicly-televised address on issues of national concern—is sufficiently related to the employment such that any alleged tortious conduct is "an outgrowth of a job-related controversy." *Carroll*, 292 A.3d at 232.

The second prong—whether conduct is "substantially within the authorized time and space limits," *Carroll*, 292 A.3d at 232 (quotation omitted)—also favors certification. The January 6 speech occurred on a weekday, during business hours, on the Ellipse with the White House as the backdrop. And even if there were questions about this prong, this Court has recognized that high-ranking officials, like the President, do not "punch[] out of work at the end of the day or when [they] leave[]

White House property." *Wilson v. Libby*, 535 F.3d 697, 712 n.2 (D.C. Cir. 2008).

Finally, the third prong of the scope-of-employment inquiry also favors certification. The record demonstrates that the President's conduct was motivated, at least in part, by a desire to serve the United States. President Trump contextualized his statements in the lead up to and at the January 6 rally in terms of election integrity and voter fraud, and many of the same concerns and criticisms are reflected in other actions he has taken as President.

In sum, the district court erred when it concluded that the January 6 speech on the Ellipse was outside the scope of the President's employment. If plaintiffs believe the President's tweets and speech were tortious in some respect, their claim is against the United States, not against the President personally. The district court's order striking the Westfall Act certification should be reversed.

3. The United States also addresses as *amicus curiae* the official-acts immunity analysis conducted by the district court. The district court erred by treating this Court's test for presidential immunity as requiring a binary sorting of the President's conduct into "office-holder"

and "office-seeker" activities. The court failed to give sufficient weight to the third possibility recognized by this Court: that "[w]hen an appropriately objective, context-specific assessment yields no sufficient clear answer in either direction, the President . . . should be afforded immunity." *Blassingame v. Trump*, 87 F.4th 1, 21 (D.C. Cir. 2023). That is the only fair conclusion that the district court could have drawn on this record.

That is especially true because, in at least one critical respect, the allegations this Court accepted as true for purposes of its decision in *Blassingame* were not borne out by discovery. Plaintiffs alleged, and this Court accepted as true, that the event at the Ellipse was organized and funded by the President's reelection campaign. In fact, as the district court acknowledged, that allegation turned out to be substantially false. *See* JA__ [Dkt. 219, at 40]. The President's re-election campaign only "played a modest role" in the event, JA__ [Dkt. 219, at 37], which was substantially planned and organized by others. The district court nonetheless labeled the entire event "office-seeker" activity because, in the court's judgment, it bore a closer "resemblance" to a campaign event than an official one.

But that was not the right question. The issue is not which of two binary categories the event more resembled. Rather, the question under this Court's decision in *Blassingame* is whether the event was so "manifestly or palpably" private in nature as to compel the withholding of immunity. 87 F.4th at 13. Because the only fair answer on this record is no, the district court erred in denying the President immunity.

The district court's contrary analysis seems implicitly to rest on an assumption about the President's motivation—an impermissible assumption under *Nixon*. The district court concluded, based substantially on the content of the President's speech, that the President was motivated solely by a desire to secure his personal re-election. In so holding, however, the court appears to have assigned no weight at all to the portions of the President's speech that addressed broader questions of national public policy, or that urged Congress to enact legislation unrelated to the 2020 election outcome. As *Nixon* makes clear, however, a court cannot parse a President's motivations in this manner and deny immunity by assuming the worst.

Indeed, it would be remarkable for this Court to hold that a President of the United States can be held personally liable in damages

for his use of the bully pulpit of the Presidency—especially where the challenged presidential speech addressed matters of unambiguous public concern—simply because the event at which the President spoke had attributes of a political rally. The district court's approach to the *Nixon* immunity analysis is contrary to the holdings of this Court and the Supreme Court and should be reversed.

## STANDARD OF REVIEW

This Court reviews de novo the district court's decision to strike the Westfall Act certification. *See Wuterich v. Murtha*, 562 F.3d 375, 383 (D.C. Cir. 2009).

## ARGUMENT

### I. The President Is Entitled To Immunity Under The Westfall Act.

This Court should reverse the order denying Westfall Act certification and allow substitution of the United States as defendant. As an initial matter, the district court erred in summarily rejecting Westfall Act immunity as co-extensive with official-act immunity under *Nixon v. Fitzgerald*, 457 U.S. 731 (1982). While many presidential acts are protected by both forms of immunity, the two doctrines are derived from different sources, serve different purposes, and function in

different ways—including, critically, in the substance of the immunity test.

Applying the correct test, it is plain that President Trump acted within the scope of his Office as President under District of Columbia *respondeat superior* law. There is no question that the President's Ellipse speech addressed matters of the utmost public concern, and it is an essential part of a President's job to speak to, and on behalf of, the American people about such matters. To be sure, there are Americans who disagreed with the views the President expressed in his speech. But sharp division in our national politics is commonplace. It was well within the scope of a President's role in our constitutional tradition for President Trump to address the public and the Congress on January 6 and to urge them emphatically to support his view of what was necessary in the public interest. The fact that the President also had a private electoral interest in the matter does not change the analysis.

### A. The District Court Wrongly Treated Westfall Act Immunity As Co-Extensive With Official-Acts Immunity.

The district court erred in striking the government's Westfall Act certification in this case on the theory that it was redundant of the President's assertion of constitutional immunity under *Nixon*.

Under the Westfall Act, a "plaintiff may contest the Attorney General's scope-of-employment certification before a district court." *Wuterich v. Murtha*, 562 F.3d 375, 381 (D.C. Cir. 2009); *see Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995). When determining whether an employee was acting within the scope of his employment, "courts apply the *respondeat superior* law in the state in which the alleged tort occurred." *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006) (per curiam). The "District of Columbia generally adheres to the analytical framework of the scope of employment inquiry set forth in the Restatement (Second) of Agency § 228(1)-(2)." *Trump v. Carroll*, 292 A.3d 220, 228 (D.C. 2023). Under that framework, an employee's conduct falls within the scope of employment if, among other things, "(a) it is of the kind the person is employed to perform; (b) it occurs substantially within the authorized

time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the" employer. *Id.* (alteration and quotation omitted). By contrast, an employee's conduct "is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the" employer. *Id.* (quotation omitted).

Although the district court recited this standard, it did not apply these legal principles to the record here. In fact, the court expressly noted that while "[t]he parties scrupulously address[ed] each of these factors[, t]he court need not do the same." JA__ [Dkt. 219, at 71] (citations omitted). Instead, the court relied entirely on its prior conclusion that the President's conduct did not constitute official acts for purposes of federal constitutional immunity under *Nixon*. *See* JA__ [Dkt. 219, at 76]. That was error.

To start, the burdens rest with different parties. It is the President's burden to establish official-acts immunity under *Nixon*. *See Blassingame v. Trump*, 87 F.4th 1, 30 (D.C. Cir. 2023). By contrast, as this Court has explained, when the Attorney General certifies that an employee was acting within the scope of his employment, that

certification "constitute[s] *prima facie* evidence that the employee was acting within the scope of his employment." *Ballenger*, 444 F.3d at 662. The plaintiff then "bears the burden of coming forward with specific facts rebutting the certification." *Id.* (quotation omitted); *see also Jacobs v. Vrobel*, 724 F.3d 217, 220-21 (D.C. Cir. 2013).[4]

---

[4] The district court believed it was an open question in this Circuit as to "which party bears the ultimate burden of proof when a Westfall Act Certification is challenged." JA__ [Dkt. 219, at 71 n.29]. In fact, it is well-settled that the burden falls on the plaintiff, as the party seeking to challenge the certification, to disprove that the employee was acting within the scope of his employment. For example, in *Wilson v. Libby*, this Court described the certification as carrying "a rebuttable presumption that the employee has absolute immunity from the lawsuit and that the United States is to be substituted as the defendant." 535 F.3d 697, 711 (D.C. Cir. 2008). And in *Kimbro v. Velten*, 30 F.3d 1501, 1509 (D.C. Cir. 1994), on which the district court relied, this Court explained that the certification is entitled to "'*prima facie*' effect," and to challenge it, the plaintiff is "oblige[d] . . . to come forward after reasonable discovery with evidence supporting his allegations both as to scope and as to the merits," *id.* (quoting *Melo v. Hafer*, 13 F.3d 736, 747 (3d Cir. 1994)). To the extent there remains any question as to the ultimate burden of proof, this Court should follow the multiple circuits that have held that the burden is on the plaintiff to prove, by a preponderance of the evidence, that the employee was acting outside the scope of employment. *See Doe v. Meron*, 929 F.3d 153, 165 (4th Cir. 2019); *Saleh v. Bush*, 848 F.3d 880, 889 (9th Cir. 2017) ("[T]he party seeking review bears the burden of presenting evidence and disproving the Attorney General's decision to grant or deny scope of employment certification by a preponderance of the evidence."); *see also Gutierrez de Martinez v. Drug Enf't Admin.*, 111 F.3d 1148, 1153-54 (4th Cir. 1997) (collecting cases).

That difference is not just academic: at several instances in its discussion of *Nixon* immunity, the district court's summary judgment decision rested on a conclusion that the President had failed to produce sufficient evidence to carry his burden. *See, e.g.*, JA__ [Dkt. 219, at 22] ("These factual contentions, individually and collectively, are not enough to carry his burden."); *see also* JA__ [Dkt. 219, at 30]; JA__ [Dkt. 219, at 39]; JA__ [Dkt. 219, at 42]; JA__ [Dkt. 219, at 48]; JA__ [Dkt. 219, at 53]; JA__ [Dkt. 219, at 55]. The district court could not properly copy-and-paste that rationale in the Westfall Act context. The burden should have been on plaintiffs to rebut the scope certification.

Second and more important, there are critical substantive differences between *Nixon* immunity and Westfall Act immunity. *Nixon* immunity derives from the Constitution and reflects a concern with insulating the official acts of the President from liability, regardless of a President's motivations for taking those acts. *See Nixon*, 457 U.S. at 749-51. By contrast, Westfall Act immunity applies to all federal employees and draws on *respondeat superior* principles, which reflect a concern to ensure that an employer may be held accountable (and thus that an injured plaintiff may sue someone other than the likely

judgment-proof employee) for all sorts of tortious or even criminal acts committed in the course of an employee's work—not merely those acts that may fall within the employee's job description. *See Harbury v. Hayden*, 522 F.3d 413, 422 n.4 (D.C. Cir. 2008) ("Many states and D.C. apply the scope-of-employment test very expansively, in part because doing so usually allows an injured tort plaintiff a chance to recover from a deep-pocket employer rather than a judgment-proof employee.").

Accordingly, this Court and the D.C. Court of Appeals have both emphasized that the scope-of-employment test is interpreted "very expansively" and that the doctrine sweeps many acts within scope. *See Jacobs*, 724 F.3d at 221 (quotations omitted); *see Carroll*, 292 A.3d at 229. Conduct is within the scope-of-employment as long as "(a) it is of the kind the person is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the" employer. *Carroll*, 292 A.3d at 228 (alteration and quotation omitted).

The first prong—the conduct is of the kind the person is employed to perform—reaches beyond formal job descriptions to include conduct that is "'of the same general nature as' or 'incidental to' the conduct

authorized." *Carroll*, 292 A.3d at 230 (emphasis omitted) (quoting Restatement (Second) of Agency § 229(1)). For example, in the District of Columbia, as long as there is "some relationship or nexus between the tortious conduct and the employee's responsibilities," courts have found that conduct committed as "an outgrowth of a job-related controversy" is within the scope of employment. *Id.* at 232 (citing *Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 32 (D.C. 1979)).

Consistent with this broad construction, "several D.C. cases [have held] that seriously criminal and violent conduct can still fall within the scope of a defendant's employment under D.C. law—including sexual harassment, a shooting, armed assault, and rape." *Harbury*, 522 F.3d at 422. The examples cited by this Court in *Harbury* are illustrative. For example, the D.C. Court of Appeals concluded that a university dean acted within scope of employment in sexually harassing a faculty member during meetings, *Howard Univ. v. Best*, 484 A.2d 958, 987 (D.C. 1984); a laundromat employee could have reasonably acted within the scope of his employment when he shot a customer during a dispute over removing clothes from washing machine, *Johnson v. Weinberg*, 434 A.2d 404, 409 (D.C. 1981); and a mattress deliveryman acted within

scope of employment in raping a customer after a dispute arose during delivery, *Lyon v. Carey*, 533 F.2d 649, 652 (D.C. Cir. 1976).

The scope-of-employment test is thus considerably more expansive than the official-acts inquiry under *Nixon* as described by this Court in *Blassingame*. Indeed, in *Blassingame*, this Court expressly rejected an approach to *Nixon* immunity that might "immunize a President from civil damages liability for alleged sexual misconduct during his presidency just because the conduct is a matter of public concern." 87 F.4th at 15.

The second and third prongs of the scope-of-employment test likewise make clear that the *respondeat superior* inquiry is fundamentally different from, and broader than, the *Nixon* official-acts inquiry. The relevant question is not whether the employee's acts were "official" in some abstract sense, but whether they were done "substantially within the authorized time and space limits." *Carroll*, 292 A.3d at 228 (quotation omitted). And unlike *Nixon*, which forbids any inquiry into the purpose or motivation for a President's action, 457 U.S. at 756, the scope-of-employment inquiry takes account of the employee's subjective "purpose": even an employee who acts primarily

for private personal purposes (*e.g.*, in committing a criminal assault) may nonetheless be within scope if the employee also acted "at least in part" for the employer's benefit as well, *Carroll*, 292 A.3d at 228 (quotation omitted).

In short, the district court erred in treating the two immunity questions as co-extensive. Both in principle and in practice, they are overlapping but distinct concepts. Most official acts of a President will be within a President's scope of employment, and vice versa. But the two immunities do not rise and fall together. In particular, unlike the "office-holder" vs. "office-seeker" dichotomy adopted by this Court in *Blassingame*, the *respondeat superior* inquiry under the Westfall Act eschews bright lines and categorical rules. The D.C. Court of Appeals in *Carroll* emphasized that it has "never adopted a rule that . . . a certain type of conduct is per se within (or outside of) the scope of employment." 292 A.3d at 240. And in applying D.C. law as outlined in *Carroll*, the Second Circuit concluded that the President could be acting within the scope of his employment even for "non-official acts." *Carroll v. Trump*, 49 F.4th 759, 765 n.3 (2d Cir. 2022); *see also Jamison v. Wiley*, 14 F.3d 222, 227 n.2 (4th Cir. 1994).

### B. The President Acted Within The Scope Of His Employment.

Applying the correct test, the President acted well within the scope of his Office with respect to plaintiffs' tort claims.[5]

#### 1. Nature of the Conduct

First, the challenged conduct by the President—a handful of public tweets, plus a televised speech on the Ellipse with the White House at his back—was unquestionably "of the kind" the President "is employed to perform." Restatement (Second) of Agency § 228(1)(a). In the District of Columbia, while this factor "plainly encompasses an employee's performance of their stated job duties," it also "extends beyond that narrow category of conduct." *Carroll*, 292 A.3d at 230. An employee's conduct falls within the scope of employment if it is "either 'of the same general nature as' or 'incidental to' the conduct authorized."

[5] The parties agreed before the district court that the core Presidential acts at issue in the Westfall Act analysis are the President's statements leading up to and at the January 6 Ellipse speech. *See* Mot. to Strike, Dkt. 183, at 16; Opp'n to Mot. to Strike, Dkt. 188 at 20. Plaintiffs have challenged additional acts and statements by the President relating to their Section 1985 claims, not the common-law tort claims for which the United States sought to substitute itself. This difference in the relevant conduct further underscores that applying the same test for the Westfall Act certification inquiry and the official acts immunity inquiry was error.

*Id.* (emphasis omitted) (quoting Restatement (Second) of Agency § 229(1)).

This Court has accordingly understood this prong of the *respondeat superior* inquiry in the District of Columbia to focus on the *type* of underlying conduct in question, not the alleged tortious conduct itself. Because no employee is employed to commit torts or crimes, it makes no sense to ask whether the specific tortious conduct itself was authorized. Rather, the court asks whether, when the allegedly tortious incident occurred, the employee was engaged in the general type of conduct for which they were employed. In *Ballenger*, for example, a case involving a defamation claim against a member of Congress for a statement given to a reporter, this Court described the conduct relevant under the first prong as the act of conducting a phone call with a reporter—not the act of giving a defamatory statement to a reporter. 444 F.3d at 661-62, 664. This was true, the Court explained, "even though the allegedly defamatory statement was made in the course of a conversation about Congressman Ballenger's marital difficulties." *Wuterich*, 562 F.3d at 384 (citing *Ballenger*, 444 F.3d at 665).

Applying this principle, this Court has repeatedly found that the underlying conduct of senior Executive Branch officials is "of the kind" they are authorized to perform, notwithstanding serious allegations of tortious (or even criminal) activity. *See, e.g.*, *Wuterich*, 562 F.3d at 384; *Wilson v. Libby*, 535 F.3d 697, 702, 712 (D.C. Cir. 2008) (finding senior White House officials, including the Vice President, were within their scope of employment when they intentionally and unlawfully "destroyed [the plaintiff's] cover as a classified CIA employee" when speaking with the press (quotation omitted)); *Rasul v. Myers*, 512 F.3d 644, 654 (D.C. Cir. 2008), (finding allegations that the defendants "authorized, implemented, supervised and condoned . . . torture and detention" at Guantanamo within scope of employment), *vacated and remanded on other grounds*, 555 U.S. 1083 (2008), *reinstated in relevant part per curiam by* 563 F.3d 527, 528-29 (D.C. Cir. 2009).

Under D.C.'s law of *respondeat superior*, the district court should have focused on the underlying conduct the President was engaged in on January 6—*i.e.*, speaking to and on behalf of the American people concerning the integrity of a presidential election and the need for vigilance in combatting voting fraud. *See* JA__ [Dkt. 219, at 57-58]

(detailing relevant conduct as Ellipse speech and tweets); *cf. Trump v. United States*, 603 U.S. 593, 629 (2024) (noting the conduct alleged in the January 6 indictment "largely consists of Trump's communications in the form of Tweets and a public address"). It is unquestionably part of the President's job to give such speeches and make such public comments.

It makes no difference for these purposes that the President gave his speech at an event organized by a private organization, or that some of his challenged remarks were made by tweet. Nothing about the President's Office requires the President to confine his official remarks or policy recommendations to the White House press room or the Oval Office. The announcement of a Presidential policy decision at a political rally, or remarks on foreign policy delivered at a privately sponsored event, are not outside the scope of the President's employment for *respondeat superior* purposes merely because of the context in which they are made. As the district court itself previously observed, it is "not the least bit unusual for first-term Presidents to comment on public policy or foreign affairs at campaign events, or, in this day, to announce

policy changes by tweet during an election year." JA__ [Dkt. 66, at 34-35].

President Trump's speech at the Ellipse was thus plainly "'of the same general nature as' or 'incidental to' the conduct" that the President is "authorized" to perform. *Carroll*, 292 A.3d at 230 (emphasis omitted). As "the only person who alone composes a branch of government," *Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020), the President must speak and act not just for a single district or State, but for all the people of the United States. "The President of the United States possesses an extraordinary power to speak to his fellow citizens and on their behalf." *Trump v. Hawaii*, 585 U.S. 667, 701 (2018). This authority includes "speak[ing] on matters" such as "the fairness and integrity of federal elections" and "encourag[ing the public] to act in a manner that promotes the President's view of the public good." *Trump v. United States*, 603 U.S. at 627.

Viewed from this perspective, the President's Ellipse speech on January 6 was entirely of a piece with Presidential speeches on the importance of fairness and integrity in federal elections, combining criticism of the status quo with policy prescriptions for the future. At a

minimum, the Ellipse speech was of the same "general nature." The speech, which ran over an hour, addressed a wide variety of topics. Assessing the 2020 election results in various States, the President explicitly addressed questions of national public concern and sought to mobilize supporters and advocate specific election-reform policies. Setting his remarks in the context of "the honesty of our elections and the integrity of our glorious republic," the President expressed his concerns that the 2020 election had been tainted by fraud and urged Congress not to certify the results without further investigation. *See, e.g.*, JA__ [Dkt. 144-47, at 3] (MSJ Ex. 42; January 6 Speech). He also repeatedly called upon Congress to repeal Section 230, which he felt enabled social media companies unfairly to "shadow ban[]" conservative speakers. JA__ [Dkt. 144-47, at 19]. And he discussed at length the need for national voter identification requirements, prohibitions on ballot drop boxes, efforts to "clean up" voter rolls to ensure that all voters are American citizens, and other "sweeping election reforms." *See generally* JA__ [Dkt. 144-47]. Many of these are topics of profound and ongoing public concern on which the President continues to give speeches and issue Executive Orders today.

Even the portions of the speech that plaintiffs highlight—for example, the President's urging that the election was at risk of being stolen, or his encouragement to his supporters to oppose the immediate certification of the election results—involved the President's use of the bully pulpit of his Office to encourage Americans "to act in a manner that promotes the President's view of the public good." *Trump v. United States*, 603 U.S. at 627. That he had personal electoral interests in the outcome does not alter the policy valence of the speech. If the President were to make similar remarks after the 2028 presidential election, when he will not be on the ballot, no one would doubt that those remarks expressed the President's policy views about the integrity of federal elections. The President was not somehow disabled from expressing the same concerns in 2020 "simply because he [was] running for re-election." *Id.*; *cf. Hawaii*, 585 U.S. at 702 (in assessing a President's speech, "we must consider not only the statements of a particular President, but also the authority of the Presidency itself").

In short, the substance of the President's speech involved traditionally presidential appeals to the public and Congress to support legislative action that was a policy priority for the administration.

Plaintiffs will undoubtedly cherry pick certain phrases in the speech, but for purposes of the *respondeat superior* inquiry, the court's job is not to evaluate the character of the statements in question for accuracy, reasonableness, or wisdom. *See, e.g.*, *Jacobs*, 724 F.3d at 221-22 (explaining the court's focus is not on the defamatory nature of the statement); *see also Schneider v. Kissinger*, 310 F. Supp. 2d 251, 265 (D.D.C. 2004) ("Defining an employee's scope of employment is not a judgment about whether alleged conduct is deleterious or actionable; rather, this procedure merely determines who may be held liable for that conduct, an employee or his boss." (emphasis omitted)). The focus is instead on the overall *type* of act performed by the employee and whether there is "some relationship or nexus between the tortious conduct and the employee's responsibilities," such that it is "an outgrowth of a job-related controversy." *Carroll*, 292 A.3d at 232. The conduct at issue here easily falls within that generous standard.

### 2. Authorized Time and Space Limits

The second prong of the scope-of-employment test considers whether the employee was "substantially within the authorized time and space limits" of his employment. *Carroll*, 292 A.3d at 232 (quotation omitted). Perhaps understandably, plaintiffs offered no meaningful argument on this score in district court, relegating their argument to a mere footnote. The January 6 speech occurred on a weekday, during business hours, on the Ellipse with the White House as the backdrop.

Even if there were questions about when President Trump took certain actions, moreover, that uncertainty would not matter to the scope inquiry. The President has no defined working hours or mandatory duty station; the President is always "on duty," whenever and wherever circumstances may take him. *See Blassingame*, 87 F.4th at 33 ("[T]he President is always on-duty . . . .") (Katsas, J., concurring). Nothing constrains when a President may communicate with the public on social media or give a speech to the public at a gathering on the Ellipse or anywhere else.

In *Wilson v. Libby*, which involved the alleged leak of a CIA agent's identity to the press, this Court observed that it was unnecessary for scope purposes to determine exactly when or where senior White House officials had communicated with the media. "Even if some conversations took place on Sunday or occurred off White House property . . . the conversations would still have occurred within the 'time and space' of employment." *Wilson*, 535 F.3d at 712 n.2. That is because, the Court explained, "[n]either the Vice President, his chief of staff, nor a close advisor to the President punches out of work at the end of the day or when he leaves White House property." *Id.* The same is even more true of the President himself.

**3. Purpose to Serve the Employer**

Finally, President Trump was within the scope of his employment on January 6 because he was "actuated, at least in part, by a purpose to serve" the United States and the American people. *Carroll*, 292 A.3d at 233 (quoting Restatement (Second) of Agency § 228(1)(c)). Because all that is necessary under District law is *some* interest to serve the employer, it does not matter whether President Trump also acted with an intention to secure his personal reelection, or even whether that was

his dominant purpose. As long as the "partial purpose to serve [the] employer was more than an insignificant interest," *id.* at 237, the employee will be treated as within the scope of his employment.

The undisputed evidence in the record demonstrates that the President was, at least to some meaningful degree, "motivated by a purpose to serve" the United States. *Carroll*, 292 A.3d at 234. The best evidence on that score comes from the Ellipse speech itself. *See generally* JA__ [Dkt. 144-47]. As discussed, the President urged the Justice Department to investigate allegations of voter fraud; highlighted the national security implications of election integrity; proposed changes to Section 230 and the regulation of social media companies; and recommended various election-reform measures to Congress. *See* JA__ [Dkt. 144-47]. Recommending those measures on January 6, 2021, could not possibly have aided the President's personal chances of prevailing in the November 2020 election, the results of which were set to be certified the same day. They were statements of public policy, not of private grievance.

Indeed, President Trump raised similar concerns about election integrity and the need for federal election reforms both shortly after his

first inauguration, *see* Exec. Order No. 13,799, 82 Fed. Reg. 22389, 22389 (May 16, 2017), and again in the spring of last year, *see* Exec. Order No. 14,248, 90 Fed. Reg. 14005, 14005 (Mar. 28, 2025). Many of the very same concerns, criticisms, and proposals raised in his January 6 speech appear in those Executive Orders, which no one doubts were official acts of the President and were within the scope of his employment as President.

* * *

This Court observed in *Wuterich* that it "is hard to fathom how [a politician]'s discussion of grave public policy concerns . . . could ever fall outside the scope of his employment." 562 F.3d at 385; *see also Does 1-10 v. Haaland*, 973 F.3d 591, 602 (6th Cir. 2020) (holding that Members of Congress acted within scope in announcing their views about public policy on the internet and through social media). The President's January 6 speech was, at least in part, a discussion of grave public policy concerns that he believed warranted immediate attention. It follows that the President acted within the scope of his federal employment. If plaintiffs believe his tweets and speech were tortious in some respect, their exclusive remedy is a Federal Tort Claims Act claim

against the United States, not against the President personally. 28 U.S.C. § 2679(d)(1). The district court's order striking the Westfall Act certification should be reversed.

## II. The President Was Entitled To *Nixon* Official-Acts Immunity.

Separately, as *amicus curiae*, the United States supports the President's appeal in No. 26-7049 with regard to *Nixon* official-acts immunity. The proper scope of absolute presidential immunity under *Nixon v. Fitzgerald* is a question of surpassing importance to the Presidency as an institution, and thus to the United States. The United States has consistently participated in cases implicating this interest, including both *Nixon* and *Clinton*.

The district court here wrongly denied the President's motion for summary judgment under *Nixon*. First, contrary to guidance from both this Court and the Supreme Court, the district court failed to give the President the benefit of the doubt after one of plaintiffs' critical allegations failed to pan out in discovery. Second, the district court's reasons for denying immunity on the undisputed factual record implicitly rested on an assumption about the President's motivation—an impermissible assumption under *Nixon*.

1. In *Blassingame*, this Court drew a sharp distinction between a President's actions as "office-*holder*" and as "office-*seeker*," holding that activities in the latter category can never qualify for official-act immunity under *Nixon*. *See* 87 F.4th at 4, 19. On remand, following discovery, the district court attempted to sort the President's actions, in binary fashion, into "office-holder" and "office-seeker" categories. Concluding that the Ellipse speech and challenged tweets were better characterized as "office-seeker" than "office-holder" activity, the court denied immunity.

The United States accepts that *Blassingame*'s "office-holder" versus "office-seeker" dichotomy is the governing law of this Circuit. This Court explained in *Blassingame*, however, that there is also a third category: activities that cannot cleanly be characterized as *either* "office-holder" or "office-seeker" conduct. *See* 87 F.4th at 20-22. That category exists because, as this Court and the Supreme Court have consistently recognized, "[d]istinguishing the President's official actions from his unofficial ones" is "difficult." *Trump v. United States*, 603 U.S. at 617; *see also id.* at 629 (cautioning against adopting any bright-line rules for presidential immunity); *Blassingame*, 87 F.4th at 12 ("The

presidential-immunity doctrine articulated in *Nixon* is capacious by design.”).

For activities in that third category, this Court explained, the President is entitled to the benefit of the doubt: immunity attaches. “When an appropriately objective, context-specific assessment yields no sufficiently clear answer in either direction, the President . . . should be afforded immunity.” *Blassingame*, 87 F.4th at 21. The Supreme Court’s subsequent decision in *Trump v. United States* specifically endorsed this aspect of this Court’s reasoning, observing that constitutional immunity protects a President’s acts from liability “so long as they are ‘not manifestly or palpably beyond his authority.’” 603 U.S. at 618 (alteration omitted) (quoting *Blassingame*, 87 F.4th at 13).

The correct question for the district court, then, was not whether the Ellipse speech or other challenged presidential conduct was better sorted, as a purely binary matter, into an “office-seeker” category rather than an “office-holder” category. The correct question was whether the challenged presidential conduct was so “manifestly or palpably beyond [his] authority” as to *require* treating it as private, office-seeker activity. *Blassingame*, 87 F.4th at 13.

The distinction matters because, in at least one critical respect, plaintiffs' allegations about the Ellipse rally—allegations that this Court accepted as true for purposes of its *Blassingame* decision—were not borne out in discovery. Specifically, plaintiffs alleged that the Ellipse rally had been organized and funded by the Trump campaign. In fact, the district court acknowledged, that allegation "has not panned out." JA__ [Dkt. 219, at 40]. Instead, discovery showed that "[a] private organization, [Women for America First], conceived of and was primarily responsible for organizing and planning the event," JA__ [Dkt. 219, at 31], and "[c]ampaign funds . . . were not used to underwrite the Rally" with a few limited exceptions, such as some equipment rentals, JA__ [Dkt. 219, at 35-36].

Applying its binary sorting methodology, the district court concluded that the Ellipse speech nonetheless fell on the "office-seeker" side of the line. The court declared that, on balance, the event "b[ore] a far stronger resemblance to campaign re-election activity than an official event." JA__ [Dkt. 219, at 41].

But that was not the right question. The issue was not whether the Ellipse rally more resembled an official event, on the one hand, or a

campaign event, on the other. There was a third, far more fitting option: that the Ellipse speech included intermingled aspects of both and cannot cleanly be sorted into one category or the other. The President gave a televised address at an event on the Ellipse, with the White House visible behind him, and addressed a host of subjects over the course of more than an hour. While the event was not organized by the White House, neither was it organized or substantially funded by the President's reelection campaign. The speech certainly included partisan electoral passages. But as previously discussed, it also expressed the President's views on public-policy questions of profound importance to the Nation—including recommendations for various electoral-reform measures that the President had previously urged Congress to adopt and has continued to recommend in his second term in Office.

The near-impossibility of neatly categorizing such an event as purely official or purely private should be unsurprising in the context of the modern Presidency. The line that this Court drew in *Blassingame* must be understood and applied with the greatest sensitivity to the complex and unremitting nature of the President's Office and role,

which are not amenable to neat dichotomies. Presidents speak to the public on questions of public concern at an enormous variety of events, some official and some nominally private. A President who announces a military action, or the appointment or removal of a subordinate officer, acts as President even when he speaks at a privately organized event or in a televised speech to donors. There is no reason a different result should obtain when the President uses such a private event to urge Congress to act, or not to act, on some matter or question before it. *Cf.* U.S. Const. art. II, § 3 (Recommendation Clause).

Indeed, absent evidence that the President's reelection campaign organized or substantially funded the Ellipse rally, there is no apparent reason why the nature or organization of that rally should make any difference to the *Nixon* official-acts analysis under an appropriate application of this Court's decision in *Blassingame*. If the President had given the identical speech on January 6, 2021, but had delivered it to TV cameras from behind the Resolute Desk, there is little doubt that the speech would have constituted an official act. That the President instead gave the speech on the Ellipse at an event funded by a private party does not, in the context of the modern Presidency, dictate any

different conclusion. It certainly does not bespeak presidential conduct that was so "manifestly or palpably beyond his authority" as to require the conclusion that it was private and not immune. *Trump v. United States*, 603 U.S. at 618 (alteration omitted) (quoting *Blassingame*, 87 F.4th at 13).

2. The district court's decision highlights the difficulty of applying this Court's office-holder/office-seeker distinction to damages claims predicated on the President's speech to the public. In holding that the Ellipse speech constituted entirely unprotected, private speech, notwithstanding the content of the speech itself, the district court appeared implicitly to rest its decision on an impermissible assumption about the President's motivations.

Plaintiffs rightly do not dispute that, for example, a President's speech about military or foreign affairs matters would fall within the outer perimeter of his Office, even if that speech were given at a private event. Likewise, a President's speech about election integrity or the need for Congress to enact electoral reforms would normally fall well within a President's official responsibilities—even if the President had latent political interests in the subject matter as well. *See Trump v.*

*United States*, 603 U.S. at 627 (observing that "the President's broad power to speak on matters of public concern does not exclude his public communications regarding the fairness and integrity of federal elections simply because he is running for re-election").

What makes this case different, according to the district court, is that the speech was delivered on the very day the 2020 election results were to be certified in favor of the President's political rival, at a private event that resembled a political rally, such that it is impossible to conclude that the President was speaking in any capacity other than his private, office-seeking activity. The court declared that the President's "alleged words and actions were directed toward promoting his victory in the 2020 presidential election." JA__ [Dkt. 219, at 43] (quoting *Blassingame*, 87 F.4th at 35 (Rogers, J., concurring in part)).

In so holding, however, the district court appears to have assigned no weight at all to the portions of the President's speech that addressed broader questions of national public policy, or that urged Congress to enact legislation unrelated to the 2020 election outcome—*e.g.*, reforms to Section 230 or prospective changes to voter-ID requirements.

Implicitly, it seems, the court simply did not believe that the President was sincere in those portions of the speech.

That approach to the immunity analysis, however, is entirely impermissible. Under *Nixon*, a court is not free to discount a President's actual words and determine what the President *really* intended. As the Supreme Court has stressed, "an inquiry into the President's motives" to determine whether a particular action was done in furtherance of a legitimate function or for nefarious reasons would "be highly intrusive" and would impermissibly "subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose." *Nixon*, 457 U.S. at 756. That is effectively what the district court did here: it characterized the Ellipse speech as entirely private, unprotected conduct only by attributing to the President a single, overriding electioneering motivation and discounting all evidence inconsistent with that theory. Other features of the same speech, however, are impossible to explain on the court's account—the portions in which the President used the bully-pulpit power of his Office to advocate for congressional action and legislative changes on questions of obvious public significance.

It would be remarkable to hold that a President of the United States can be personally liable in damages based on his use of that bully pulpit—especially where the challenged presidential speech addressed matters of unambiguous public concern—simply because the event at which the President gave the speech had attributes of a political rally. Here, the district court agreed with the President that the Ellipse event "was not a fully baked campaign event" and that the allegation that the President's campaign had organized the event was unproven but nonetheless found that because "the Campaign had a hand in it" and the White House largely did not, it could not be an official event under this Court's *Blassingame* test. JA__ [Dkt. 219, at 41]. The better conclusion was that the President was entitled to immunity if the event could not be neatly characterized as official or private.

* * *

In sum, a court faced with a damages claim seeking to hold a President personally liable for his speech to the public should deny absolute immunity only if the speech—viewed objectively, as a whole, and in context—was so "manifestly or palpably beyond [his] authority" as President that it must be characterized as private and unprotected.

*Blassingame*, 87 F.4th at 13. If a fair assessment of the record does not yield a "sufficiently clear answer in either direction," the President is immune. *Id.* at 21.

## CONCLUSION

For the foregoing reasons, the district court's order denying Westfall Act certification and official-acts immunity should be reserved.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
BRAD HINSHELWOOD
*/s/ Laura E. Myron*
LAURA E. MYRON
*Attorneys, Appellate Staff*
*Civil Division, Room 7228*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

September 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,532 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Laura E. Myron*
LAURA E. MYRON