NOT YET SCHEDULED FOR ORAL ARGUMENT

# United States Court of Appeals for the District of Columbia Circuit

**No. 26-7049**

(Consolidated with 26-7052, 26-7123, 26-7154)

BARBARA J. LEE, et al.,

*Plaintiffs-Appellees,*

*v.*

PRESIDENT DONALD J. TRUMP, et al.,

*Defendants-Appellants.*

*On Appeal from the United States District Court for the District of Columbia in No. 1:21-cv-00400-APM*

*Consolidated Member Cases: 21-cv-00586 (APM); 21-cv-00858 (APM); 21-cv-02265 (APM); 22-cv-00010 (APM); 22-cv-00011 (APM); 22-cv-00034 (APM); 23-cv-00038 (APM)*

# PRESIDENT DONALD J. TRUMP'S OPENING BRIEF

CARYN G. SCHECHTMAN
M. DAVID JOSEFOVITS
AARON C. WARD
DLA PIPER LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York 10020-1104
(212) 335-4500

JESSE R. BINNALL
GERALD A. URBANEK, JR.
BINNALL LAW GROUP
717 King Street, Suite 200
Alexandria, Virginia 22314
(703) 888-1943

JOSHUA HALPERN
JH LEGAL PLLC
1100 H Street, NW, Suite 840
Washington, D.C. 20005
(610) 405-5531

JONATHAN M. SHAW
DHILLON LAW GROUP, INC.
2121 Eisenhower Ave.
Suite 608
Alexandria, Virginia 22314
(703) 574-1206

*Counsel for Defendant-Appellant President Donald J. Trump*

September 1, 2026

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (816583)

## CERTIFICATE ON PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici Curiae

Defendants appearing before the district court and/or before this Court include President Donald J. Trump; Donald J. Trump For President, Inc.; Make America Great Again PAC; Stop the Steal L.L.C.; Proud Boys; Proud Boys International, L.L.C.; Oath Keepers; Warboys LLC; Enrique Tarrio; Ethan Nordean; Joseph R. Biggs; Zachary Rehl; Charles Donohoe; Dominic J. Pezzola; Stewart Rhodes; Thomas E. Caldwell; Jessica Watkins; Kelly Meggs; Alan Hostetter; Erik Scott Warner; Felipe Antonio Martinez; Derek Kinnison; Ronald Mele; John Does 1-10; and the United States of America.

Plaintiffs appearing before the district court and/or before this Court include Bonnie Watson Coleman; Pramila Jayapal; Maxine Waters; Jerrold Nadler; Henry C. Johnson; Stephen I. Cohen; Barbara J. Lee; Veronica Escobar; Marcia Kaptur; Governor Latson; Danny McElroy; Melissa Marshall; Michael Fortune; Jason Deroche; Reginald Cleveland; Conrad Smith; James Blassingame; Sidney Hemby; Eric Swalwell; Briana Kirkland; Bobby Tabron; DeDivine K. Carter; Marcus

J. Moore; and Sandra Garza, individually and as the personal representative of the Estate of Brian Sicknick.

### B. Rulings Under Review

(i) Memorandum Opinion of the U.S. District Court for the District of Columbia (Mehta, J.), docketed March 31, 2026, denying in part President Donald J. Trump's Motion for Summary Judgment with respect to official-acts immunity, and denying in full President Donald J. Trump's Motion for Reconsideration with respect to the First Amendment. *Lee v. Trump*, 2026 WL 880161 (D.D.C. Mar. 31, 2026); and

(ii) Order of the U.S. District Court for the District of Columbia (Mehta, J.), docketed February 18, 2022, denying Defendant-Appellant Donald J. Trump's Motion to Dismiss with respect to the First Amendment. *Thompson v. Trump*, 590 F. Supp. 3d 46 (D.D.C. 2022).

### C. Related Cases

This Court consolidated this appeal with Case No. 26-7052, *Barbara Lee, et al. v. Donald Trump*, *et al.* (D.C. Cir.), Case No. 26-7123, *Barbara Lee, et al. v. Donald Trump*, *et al.* (D.C. Cir.), Case No. 26-7154, *Barbara Lee, et al. v. Donald Trump*, *et al.* (D.C. Cir.), and with Case No. 26-8003, *In re: Donald J. Trump* (D.C. Cir.).

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... v

INTRODUCTION ..... 1

STATEMENT OF JURISDICTION ..... 9

STATEMENT OF THE ISSUES ..... 9

STATEMENT OF THE CASE ..... 10

A. Ellipse Speech ..... 10

B. Ensuing Lawsuits, and President Trump's Motions to Dismiss on Immunity and First Amendment Grounds ..... 15

C. *Blassingame v. Trump* and *Trump v. United States* ..... 18

D. President Trump Moves for Summary Judgment ..... 19

SUMMARY OF ARGUMENT ..... 21

STANDARD OF REVIEW ..... 25

ARGUMENT ..... 25

I. The Claims Against President Trump Are Barred by Presidential Immunity. ..... 25

A. The Ellipse Speech Was an Exercise of the Recommendations Clause. ..... 28

B. The Ellipse Speech Is Also Official Under the President's Bully Pulpit Power. ..... 36

C. The District Court's Contrary Reasoning Is Wrong. ..... 48

D. President Trump's Other Communications and Actions on Election Integrity Also Fall Within the Outer Perimeter of His Official Responsibilities. ..... 54

II. The First Amendment Independently Bars the Claims Against President Trump. .......... 58

A. There Is No "Implicit Incitement" Exception to the First Amendment. .......... 61

B. At Minimum, Implied Incitement Must Be the Only Reasonable Meaning of the Speech. .......... 64

C. The Best—Indeed, the Only Reasonable—Interpretation of the Speech Is a Call for Peaceful Political Advocacy. .......... 68

CONCLUSION .......... 83

CERTIFICATE OF COMPLIANCE .......... 85

CERTIFICATE OF SERVICE .......... 86

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anderson v. Creighton*,
483 U.S. 635 (1987) .......... 50

*Bible Believers v. Wayne County*,
805 F.3d 228 (6th Cir. 2015) .......... 63

*Blassingame v. Trump*,
87 F.4th 1 (D.C. Cir. 2023)
.......... 4, 15-18, 20, 22, 25-28, 36, 37, 41-44, 46-48, 51-53

*Chaplinsky v. New Hampshire*,
315 U.S. 568 (1942) .......... 60

*Clinton v. Jones*,
520 U.S. 681 (1997) .......... 48, 51, 58

*Colindres v. U.S. Dep't of State*,
71 F.4th 1018 (D.C. Cir. 2023) .......... 54-55

*Connick v. Myers*,
461 U.S. 138 (1983) .......... 59

*Counterman v. Colorado*,
600 U.S. 66 (2023) .......... 24, 60, 62, 66, 67, 69, 79, 80

*Dyer v. McCormick & Schmick's Seafood Rests., Inc.*,
264 F. Supp. 3d 208 (D.D.C. 2017) .......... 47

*Fed. Election Comm'n v. Wisconsin Right to Life*,
551 U.S. 449 (2007) .......... 24, 64, 65, 66, 68, 73

*Garrison v. Louisiana*,
379 U.S. 64 (1964) .......... 59

*Garza v. Trump*,
709 F. Supp. 3d 1 (D.D.C. 2024) .......... 17

*Herceg v. Hustler Mag., Inc.*,
814 F.2d 1017 (5th Cir. 1987) .......... 61-62

*Hou. Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) .......... 63

*King v. Jackson*,
487 F.3d 970 (D.C. Cir. 2007) .......... 25

*Kingsley v. Hendrickson*,
576 U.S. 389 (2015) .......... 48

*Lee v. Trump*,
2026 WL 880161 (D.D.C. Mar. 31, 2026) .......... 6, 10, 15-17, 19, 21

*Lilly v. District of Columbia*,
657 F. Supp. 3d 65 (D.D.C. 2023) .......... 28

*Lindke v. Freed*,
601 U.S. 187 (2024) .......... 55

*Mills v. Alabama*,
384 U.S. 214 (1966) .......... 59

*Mitchell v. Forsyth*,
472 U.S. 511 (1985) .......... 9

*Moore v. Trump*,
2022 WL 3904320 (D.D.C. Aug. 2, 2022) .......... 16, 17

*National Ass'n for the Advancement of Colored People v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) .......... 55, 59, 82

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) .......... 25, 26, 27, 48

*Nwanguma v. Trump*,
903 F.3d 604 (6th Cir. 2018) .......... 61, 63

*Pulsifer v. United States*,
601 U.S. 124 (2024) .......... 32

*Smith v. Trump*,
2023 WL 417952 (D.D.C. Jan. 26, 2023) .......... 15, 17, 46

*Snyder v. Phelps*,
562 U.S. 443 (2011) .......... 38, 40

*Tavoulareas v. Piro*,
817 F.2d 762 (D.C. Cir. 1987)........................................................25

*Thompson v. Trump*,
590 F. Supp. 3d 46 (D.D.C. 2022) ....16, 17, 54, 59, 62, 70, 71-74, 77, 78

*Trump v. Anderson*,
601 U.S. 100 (2024) ........................................................................63

*Trump v. Hawaii*,
585 U.S. 667 (2018) ......................................................................2, 36

*Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020) ........................................................................43

*Trump v. United States*,
603 U.S. 593 (2024)
........................ 2, 5, 6, 18-22, 26, 27, 30, 35-42, 48, 51-53, 56-58, 66, 82

*United States v. Dorcely*,
454 F.3d 366 (D.C. Cir. 2006)........................................................68

*Wash. Post Co. v. Keogh*,
365 F.2d 965 (D.C. Cir. 1966)...................................................59, 67

*Watts v. United States*,
394 U.S. 705 (1969) ........................................................................60

*Winslow v. FERC*,
587 F.3d 1133 (D.C. Cir. 2009) ...................................................67-68

*Wright v. United States*,
302 U.S. 583 (1938) ........................................................................32

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ........................................................................26

**Constitutional Statutes & Rules:**

U.S. Const. art. I § 7-9 .......... 32

U.S. Const. art. II § 3 .......... 2, 28, 31, 32, 34, 36

28 U.S.C. § 1291 .......... 9

28 U.S.C. § 1292(b) .......... 9

28 U.S.C. § 1331 .......... 9

42 U.S.C. § 1985(1) .......... 16

Fed. R. Civ. P. 12(g)(2) .......... 28

Federal Rule of Evidence 801(d)(2) .......... 46

**Other Authorities**

167 Cong. Rec. S672 (daily ed. Feb. 12, 2021) .......... 72

1 St. George Tucker, Blackstone's Commentaries (1803) .......... 29

3 Joseph Story, Commentaries on the Constitution § 1555 (1833) .......... 29

Barack Obama, *Remarks at AIPAC Policy Conference,* 1 Pub. Papers 249 (Mar. 4, 2012) .......... 53

Barack Obama, Remarks at Rally for Governor Jon Corzine, 2 Pub. Papers 1117 .......... 33

C. Ellis Stevens, Sources of the Constitution (1894) .......... 32

Chad Squitieri, *The Recommendation Clause, in* The Heritage Guide to the Constitution (Josh Blackman & John G. Malcolm eds., 3d ed 2025) .......... 34

Chad Squitieri*, "Recommend … Measures": A Textualist Reformulation of the Major Questions Doctrine*, 75 Baylor L. Rev. 706 (2023) .......... 28, 29

Bill Clinton, Remarks Upon Arrival in Detroit, Michigan, 2 Pub. Papers 1442 (Aug. 6, 1994) .......... 33

Franklin D. Roosevelt, Fireside Chat Discussing the Plan for Reorganization of the Judiciary, 1 Pub. Papers 122 .......... 33

George W. Bush, Radio Address by the President to the Nation, 2 Pub. Papers 1629 .......... 33

J. Gregory Sidak, *The Recommendation Clause*, 77 Geo. L.J. 2079 (1989) .......... 32

Ronald Reagan, Address to the Nation on Federal Tax Reduction Legislation, Pub. Papers 664 (July 27, 1981) .......... 33

Ronald Reagan, Remarks to Participants in the March for Life Rally, 1 Pub. Papers 74, 75–76 (Jan. 22, 1988) .......... 53

Samuel Johnson, A Dictionary of the English Language (1755) .......... 31

# INTRODUCTION

On January 6, 2021, President of the United States, Donald J. Trump, addressed the Nation from the White House Ellipse regarding several topics of national importance, including the 2020 Presidential Election and a proceeding of Congress that was about to begin (the "Ellipse Speech" or "Speech"). President Trump has consistently believed that the 2020 election had been marred by serious irregularities. As he made the Ellipse Speech, he believed that Congress and the Vice President could and should act. He also believed that the country badly needed reforms to prevent the same problems from recurring.

So, in a nationally televised address, the President laid out his case, appealed directly to Congress and the Vice President, proposed changes to federal election law, and asked citizens to press their representatives to act. When President Trump urged his supporters to walk to the Capitol, he specifically directed how and for what: "peacefully and patriotically" to "make [their] voices heard." That presidential action and core political speech are clearly protected by Presidential immunity and the First Amendment. Yet, President Trump has been forced to spend years defending the Ellipse Speech in court—a striking illustration of

what happens when the constitutional protections for presidential action and political speech are wrongly denied at the threshold.

The Constitution gives the President a distinctive and singular role: to identify national problems, propose governmental solutions, and use the authority of his office to persuade Congress and the public to act. Indeed, the Constitution affirmatively requires the President to recommend to Congress the "measures" he judges "necessary and expedient." U.S. Const. art. II, § 3. And the Supreme Court has long recognized the President's "extraordinary power to speak to his fellow citizens and on their behalf." *Trump v. Hawaii*, 585 U.S. 667, 701 (2018).

Presidential immunity exists so that a President can perform those functions without fear of years of expensive litigation, including motions, discovery, and even a trial. The office demands "bold and unhesitating action," not a constant calculation about whether some future court might expose the President to personal liability based on facts he did not know, private actors he did not control, or events that had not yet occurred. *Trump v. United States*, 603 U.S. 593, 613 (2024). If official status, and immunity with it, can be allowed to disappear years later because of a third-party's motive, an aide's choice of device, a donor's

political history, or what someone did after the President finished speaking, immunity ceases to protect presidential decisionmaking at all, and the Presidency itself is crippled.

The Constitution's First Amendment separately guards against parallel dangers. Political speech is protected precisely because democratic debate is often heated, accusatory, urgent, and unpopular. The First Amendment gives speakers room to condemn government action, demand political change, rally supporters, pressure legislators, and use the language of political combat without fearing that a court will later assign their words a distorted "contextual" meaning. Constitutional protection would be hollow if a speaker who called expressly for peaceful political action could nonetheless be held liable because a court inferred an unspoken command from alleged intent, audience characteristics, generic "fight" language common in political discourse, or subsequent events. That is why incitement is an exceedingly narrow, little-used exception to the First Amendment's sweeping and robust protection for political expression.

This case sits at the intersection of those two vital constitutional protections. In the Ellipse Speech, President Trump addressed, among

other key official topics, the integrity of a national election, a joint session of Congress minutes away, the Vice President's responsibilities as President of the Senate, and prospective reforms to federal election law. He urged Congress to count only electors he believed were lawfully appointed. He called for citizenship requirements, restrictions on ballot harvesting and drop boxes, cleaner voter rolls, and a return to in-person voting. The President asked the public to support those recommendations by walking to the Capitol, cheering supportive lawmakers, stiffening the resolve of wavering Republicans, and making their voices heard "peacefully and patriotically."

The Ellipse Speech thus gives rise to immunity under the Recommendations Clause—a constitutional provision this Court has yet to consider. *See generally Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023). The Recommendations Clause does not merely permit the President to recommend measures to Congress; it commands him to do so. The Ellipse Speech did exactly that: it identified what the President regarded as a national wrong, proposed remedies Congress could enact, and urged the public to support those recommendations. That exercise of

a core and expressly enumerated Article II function independently resolves the immunity question and ends this case.

Further, the Ellipse Speech is also independently immune because it falls squarely within the President's bully-pulpit authority. A President's public voice is itself an instrument of office: he is expected to speak to the Nation, press Congress and other officials to act, and rally public support on matters he believes advance the public interest. The Supreme Court has made clear that "most of a President's public communications" fall comfortably within his official responsibilities, when the Court recognized the "bully pulpit" as "a long-recognized aspect of Presidential power." *Trump v. United States*, 603 U.S. at 629. The Ellipse Speech—which was an address to the Nation about Congress, the Vice President, election integrity, and other topics of national importance—is reasonably understood as within the President's official duties, irrespective of whether a narrow category may exist for speech delivered solely as a candidate or party leader (which is highly questionable).

The First Amendment independently requires this case to end. The district court acknowledged that President Trump "did not explicitly

encourage the imminent use of violence or lawless action." Op. 63.[1] Yet it erroneously allowed these claims to proceed on a theory of "implicit" incitement—an unspoken command supposedly revealed by surrounding allegations and context. *Id.* No Supreme Court decision recognizes such an amorphous, free-floating, and hollowing limitation on the First Amendment's protection. No federal appellate court has sustained liability on that basis against anyone, much less against the President of the United States. Such a limit on First Amendment protection is impossible to reconcile with the Ellipse Speech, which repeatedly identified official, political means and official, political ends: congressional objections, public pressure, elections, primary challenges, walking to the Capitol, cheering lawmakers, and making voices heard "peacefully and patriotically."

The district court erred in reaching the opposite result on both immunity and the First Amendment by ignoring what the President actually said. On immunity, the district court wrongly discounted the Speech's content and relied on supposed backstage details ranging from

---

[1] The Memorandum Opinion denying summary judgment, *Lee v. Trump*, No. 21-cv-400, 2026 WL 880161 (D.D.C. Mar. 31, 2026), ECF No. 219, is cited as "Op. __."

private organizers' motives to aides' devices and post-event publication decisions—many unknown to the President, some not even in existence when he spoke. On the First Amendment, the district court acknowledged the absence of any express incitement but improperly supplied one by implication from alleged private intent, supposed audience disposition, and events outside the words of the Speech itself. All of that was error.

The district court's erroneous ruling strips both constitutional protections of their practical force. Immunity must protect the President when he speaks, not after years of discovery reveal what strangers, aides, donors, or organizers privately thought or later did. And the First Amendment must protect the President based on the words he actually spoke; its protection cannot be denied based on a hidden, purportedly forbidden meaning a court later constructs from circumstances surrounding it. On both fronts, immunity and the First Amendment, the Constitution mandates a swift end to this case, because hesitation is itself a constitutional injury: a President distracted by fear of personal liability is less capable of energetic government, and a President forced to "hedge and trim" against every possible implication is less free to participate in democratic debate.

The vital implications for our system of government extend well beyond this case, and well beyond January 6. Presidents speak during elections, protests, congressional confrontations, crises, and moments of profound national disagreement. They press Congress, criticize institutions, rally public support, and ask citizens to make their views known. Ordinary Americans do the same. If the legal character of those acts can be rewritten after the fact based on circumstances beyond the speaker's knowledge or control, both the Presidency and political speech become hostage to hindsight and are crippled.

The Constitution does not tolerate any ambiguity or uncertainty. It protects an energetic Executive and robust political advocacy precisely when controversy is greatest. The Ellipse Speech was official presidential conduct, including an exercise of the President's express constitutional duty to recommend measures to Congress. It was also core political speech that came nowhere close to crossing *Brandenburg*'s narrow line. The decision below deals a decisive blow to the Presidency, the political process, and the freedom of expression all at once. This Court should reverse.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291 because the district court's denial of the President's immunity is a "final" decision. *Mitchell v. Forsyth*, 472 U.S. 511, 524–25 (1985). This Court has jurisdiction under 28 U.S.C. § 1292(b) because the district court certified its denial of the President's First Amendment defense for interlocutory appeal on March 31, 2026, and this Court granted permission to appeal on June 4, 2026.

## STATEMENT OF THE ISSUES

1. Whether the President's conduct is immune from civil liability because the President's January 6, 2021, Ellipse Speech on topics of national importance, including urging Congress and the Vice President to act, as well as for electoral reforms to be passed, falls within the outer perimeter of his official responsibilities, and whether it also reasonably falls within the power expressly assigned to the President in the Constitution's Recommendations Clause.

2. Whether Plaintiffs plausibly alleged that the final few lines of President Trump's January 6, 2021, Ellipse Speech—a speech that did not explicitly advocate imminent lawless action and, in fact, called on his

supporters to "peacefully and patriotically make [their] voices heard"—constitute unprotected incitement under the First Amendment.

## STATEMENT OF THE CASE

### A. Ellipse Speech

On January 6, 2021, Congress convened in joint session to count the electoral votes, with Vice President Mike Pence presiding as President of the Senate under the Twelfth Amendment and the Electoral Count Act. Shortly before the proceeding, President Trump addressed Congress, the Vice President, and the public from the White House Ellipse in a nationally televised address to the Nation.

The Ellipse Speech focused on election integrity—the President's "last appeal to Congress," and to Vice President Pence in his capacity as President of the Senate. MSJ Ex. 122 at 74:23–25.[2] The President framed the event in national and constitutional terms, telling the audience that "[w]e're gathered together in the heart of our nation's capital for one very, very basic and simple reason: to save our democracy." MSJ Ex. 42 ("Sp.")

---

[2] "MSJ" refers to the President's Motion for Summary Judgment on Presidential Immunity, *Lee v. Trump*, No. 21-cv-400 (D.D.C.), ECF No. 144. The parties used continuous, joint numbering of summary judgment exhibits, which are cited here as "MSJ Ex. __."

at 6.[3] The President also addressed those assembled as "American patriots who are committed to the honesty of our elections and the integrity of our glorious republic." Sp. 3.

The President then turned to the facts as he assessed them. The President explained that he would "lay out just some of the evidence proving that we won this election." Sp. 3. In "every single swing state," the President described the many ways in which "local officials, state officials, almost all Democrats made illegal and unconstitutional changes to election procedures without the mandated approvals by the state legislatures"—changes that, in the President's evaluation, "pave[d] the way for fraud on a scale never seen before." Sp. 15–16. The President then detailed many voting irregularities in Pennsylvania, Wisconsin, Georgia, Arizona, Nevada, and Michigan. Sp. 20–27.

Against that backdrop, the President repeatedly addressed Vice President Pence in his capacity as President of the Senate, imploring him to take curative action in light of widescale fraud. "I hope Mike is going to do the right thing," the President stated, because "[h]e has the absolute

[3] Page references to the Speech are to the blue page numbers in the header generated by the district court's e-filing system.

right to do it." Sp. 4. The President reaffirmed our collective responsibility to "protect our country, support our country, support our Constitution, and protect our Constitution." Sp. 4. In the President's stated view, "[a]ll Vice President Pence has to do is send it back to the states to recertify." Sp. 4–5. So, near the end of the speech, the President made one final appeal: "Mike Pence, I hope you're going to stand up for the good of our Constitution and for the good of our country." Sp. 22.

Throughout the Speech, the President also addressed Congress in equally direct terms. He urged Congress "to confront this egregious assault on our democracy," Sp. 8, and declared that "[w]e have come to demand that Congress do the right thing and only count the electors who have been lawfully slated," Sp. 9. Election integrity, the President explained, was "not just a matter of domestic politics" but "a matter of national security." Sp. 28.

The President also called on Congress and state legislators to take action to prevent future abuses by "quickly pass[ing] sweeping election reforms." Sp. 28. The President's recommendations included "powerful requirements for voter ID"; "proof of American citizenship in order to vote in American elections"; a ban on "ballot harvesting" and on "the use of

unsecured drop boxes"; an end to "the practice of universal unsolicited mail-in balloting"; a cleanup of "the voter rolls"; and a restoration of "the vital civic tradition of in-person voting on Election Day." Sp. 29.

The President then asked the public to amplify that message by walking down Pennsylvania Avenue to "peacefully and patriotically make [their] voices heard." Sp. 9. "[W]e're going to walk down to the Capitol," the President explained, and "we're going to cheer on our brave senators and congressmen and women." Sp. 8. The goal, the President said, was to give Republicans "the kind of pride and boldness that they need to take back our country." Sp. 31.

At various points in the Speech, the President used the word "fight" as a common political metaphor. He praised Rudy Giuliani because "[h]e fights," and Jim Jordan and others because "they're out there fighting. The House guys are fighting." Sp. 4, 6–7. The President told supporters to "get your people to fight" in connection with congressional objections and vowed to "primary the hell out of the ones that don't fight." Sp. 7. Using a well-known metaphor, the President faulted Republican lawmakers for "fighting like a boxer with his hands tied behind his back" and said they needed "to fight much harder." Sp. 8. The President

concluded: "And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore." Sp. 31. The President never instructed anyone to breach the Capitol, assault police, damage property, or halt certification by force. The President never called for violence in the Ellipse Speech; instead, he called for peace and patriotism.

The White House drafted and reviewed the Speech, transmitted it through official channels, and secured the Ellipse location to connect the event to the White House and the Presidency. Def.'s Stmt. ¶¶ 34–36, 54–55; Def.'s Counterstmt. ¶ 314; Op. 21–26.[4]

The Campaign's involvement was minimal.[5] The nonprofit Women for America First—not the Campaign—conceived, organized, promoted, permitted, and principally funded the rally. Def.'s Counterstmt. ¶¶ 124–29, 178, 181–85, 203, 211, 215, 253–55; Op. 31–32. The Campaign

---

[4] Def.'s Statement of Undisputed Material Facts in support of the MSJ [hereinafter "Def.'s Stmt."]; Def.'s Counterstatement to Plaintiffs' Statement of Additional Material Facts [hereinafter "Def.'s Counterstmt."] [ECF Nos. 144-2, 175-2 [redacted version at 174-2]].

[5] The "Campaign" refers to Donald J. Trump for President, Inc. Op. 31; *see, e.g.*, Smith Am. Compl. ¶ 20; *Swalwell* Compl. ¶ 97.

contributed only a handful of social-media posts, a $400 payment to one employee for unspecified services, and an equipment-rental payment for an unspecified event Plaintiffs allege was the Save America Rally. Op. 36–37, Ex. 243; Def.'s Counterstmt. ¶ 204. In addition, a political consultant began working for the organizers of the Rally shortly after Christmas, a few days before formally winding up her time at the Campaign on December 31. Op. 37–38; MSJ Ex. 27.

### B. Ensuing Lawsuits, and President Trump's Motions to Dismiss on Immunity and First Amendment Grounds

Before President Trump had finished the Ellipse Speech, groups of protestors began making their way to the Capitol. *Blassingame* Am. Compl. ¶¶ 65–66. Some participants later turned violent, resulting in a breach of the Capitol.

Plaintiffs—Members of Congress and Capitol Police Officers—filed eight now-consolidated actions against President Trump, wrongly alleging injuries from the Capitol breach. Six name President Trump alone; two (*Lee* and *Smith*) assert conspiracy claims against additional defendants. ECF No. 2179183 at 5–7.

In all cases, Plaintiffs falsely alleged that President Trump's words at the Ellipse constituted incitement that proximately caused the breach

of the Capitol and the injuries they suffered. *Thompson*, 590 F. Supp. 3d at 62–63, 113–15. The complaints also made false allegations about the President's communications in the lead-up to, and after, January 6, including his tweets and his communications with state lawmakers and other state and local officials concerning the 2020 election. Every complaint alleges that the Ellipse Speech and other election-integrity communications were part of a conspiracy to prevent them from carrying out their official duties, in violation of 42 U.S.C. § 1985(1). *Id.* at 63. The *Smith* complaint—along with the single-defendant cases *Kirkland*, *Moore*, *Tabron*, and *Swalwell*—also alleges that President Trump "aided and abetted" assaults and batteries against the Plaintiffs through the Speech.

President Trump moved to dismiss on, among others, immunity and First Amendment grounds. Plaintiffs falsely characterized the Speech and rally as campaign activity, even though election day had passed over two months before, wrongly alleging with no basis or support that the Campaign organized and funded the event and helped plan the march to the Capitol. *Lee* MTD Opp'n at 2, 65; *Blassingame* MTD Opp'n at 26.

The district court wrongly denied the motions to dismiss on these grounds in *Lee*, *Blassingame*, and *Swalwell* in February 2022. *Thompson*, 590 F. Supp. 3d at 77, 108.[6]

On immunity, the district court erroneously held that the Speech and related election-integrity communications were unofficial campaign activity, relying heavily on allegations that the Campaign organized, funded, and helped plan the rally and march. *Thompson*, 590 F. Supp. 3d at 65, 77–83.

On the First Amendment, the court acknowledged that President Trump's words "did not explicitly encourage the imminent use of violence or lawless action," yet wrongly held that Plaintiffs had plausibly alleged implicit incitement based on his use of "fight," his supposed knowledge of the crowd, and his prior statements. *Id.* at 115–17. That was also error.

[6] The court later denied materially identical motions on the same grounds in the remaining cases. *Moore v. Trump*, 2022 WL 3904320, at *1 (D.D.C. Aug. 2, 2022) (also resolving *Tabron* and *Kirkland*); *Smith v. Trump*, 2023 WL 417952, at *1 (D.D.C. Jan. 26, 2023); *Garza v. Trump*, 709 F. Supp. 3d 1, 4 (D.D.C. 2024).

### C. *Blassingame v. Trump* and *Trump v. United States*

President Trump appealed, and this Court affirmed on December 1, 2023. *Blassingame*, 87 F.4th at 1.

This Court held that immunity attaches if the conduct "could reasonably be understood" as official, or if there is "no sufficiently clear answer in either direction." *Id.* at 21–23. It remanded to determine whether President Trump acted as an office-holder or solely as an office-seeker, focusing principally on allegations of campaign funding and planning. *Id.* at 20, 30.

In July 2024, seven months after *Blassingame*, in a case also focused on President Trump's actions in the aftermath of the contested 2020 Presidential Election, including the Ellipse Speech, the Supreme Court decided *Trump v. United States*, 603 U.S. 593 (2024). It did not embrace the test this Court outlined in *Blassingame*, holding instead that "most of a President's public communications" are official acts. 603 U.S. at 629. The Court reasoned that "a long-recognized aspect of Presidential power is using the office's 'bully pulpit' to persuade Americans, including by speaking forcefully or critically, in ways that the President believes would advance the public interest," even on "matters of public concern

that may not directly implicate the activities of the Federal Government." *Id.*

The Court held that the President's "extraordinary power to speak to his fellow citizens" extends to all public statements "not manifestly or palpably beyond" his broad official role. *Id.* at 618, 629. To determine whether a Presidential statement is in fact "manifestly or palpably" unofficial, courts must conduct an "objective analysis of [its] content, form, and context." *Id.* at 629 (internal quotation marks omitted). That includes asking "what else was said contemporaneous[ly]." *Id.* at 630.

The Court separately held that communications between the President and Vice President concerning their official responsibilities generally, and regarding the 2020 Presidential Election specifically, are official conduct. *Id.* at 623.

### D. President Trump Moves for Summary Judgment

After nearly a year of immunity discovery, President Trump moved for summary judgment on presidential immunity grounds. *Lee* ECF No. 144-1. The President stated that the Ellipse Speech and related communications exercised his authorities under the Recommendations Clause, the Take Care Clause, and the bully-pulpit power, as well as that

the Speech's content, form, and contemporaneous context confirm its official character. *Id.* Plaintiffs' false allegations that the Ellipse Speech and rally were campaign events "ha[d] not panned out." Op. 40. The record showed that Women for America First organized the rally, and the White House prepared the Speech. Plaintiffs instead tried to rely on peripheral, immaterial facts unknown to the President and on events occurring after he spoke, including aides' devices and email accounts, as well as later publication and archiving decisions. MSJ Opp'n at 5, 33, 38, 40.[7]

On March 31, 2026, the district court nevertheless erroneously denied summary judgment on immunity. Op. 57–58. In error, it deemed the Speech's content secondary and found unofficial "hallmarks" in contextual details, including facts unknown to the President and post-rally events. *Id.* at 7, 11, 38–39, 42.

The court also reaffirmed its erroneous First Amendment ruling, again acknowledging no express incitement, but somehow finding that "fight" could plausibly constitute implicit incitement in light of prior

---

[7] Plaintiffs' Opposition to the MSJ [hereinafter "MSJ Opp'n"] [ECF No. 155-1 [redacted at ECF No. 152]].

statements, the crowd's composition, and alleged magnetometer-related remarks. The district court certified that issue for interlocutory appeal. Op. 58–69.

President Trump timely filed a notice of appeal from the immunity ruling and a petition for discretionary appeal from the First Amendment rulings. *Lee* ECF No. 220; ECF No. 2168570. This Court granted President Trump's petition and stayed proceedings pending appeal. ECF Nos. 2176810, 2183657.

## SUMMARY OF ARGUMENT

I. Plaintiffs' claims are barred by absolute presidential immunity. In the Ellipse Speech, the President addressed, among many topics of national importance, election integrity, urged Congress and the Vice President to act in an imminent federal proceeding, and proposed reforms to federal election law. At minimum, in accordance with *Trump v. United States*, the Ellipse Speech can reasonably be understood as official conduct; it absolutely cannot reasonably be understood only as private campaign activity.

I.A. The Speech exercised the President's constitutional recommendation power. President Trump identified what he regarded as

serious defects in the election, urged Congress to count only lawfully appointed electors, and recommended prospective election reforms. His appeal to citizens to carry that message to Congress was a traditional way to advance presidential recommendations. Because President Trump exercised an enumerated Article II power, he is absolutely immune.

I.B. The Speech also falls within the outer perimeter of the President's bully-pulpit authority. The content, form, and context of the Speech all confirm its official character: President Trump addressed the Nation about election integrity, a pending congressional proceeding, as well as the Vice President's official role, and he also proposed changes to federal law. The record also disproved the premise that the Campaign organized or funded the event, which is not a dispositive factor in any event. Under either *Trump* or *Blassingame*, the Speech is official.

I.C. The district court erroneously reached the opposite conclusion only by wrongly discounting the Speech's content, relying on obscure facts unknown to the President, considering events that occurred after he spoke, and inventing an "official-trappings" requirement found nowhere in precedent. Presidential immunity cannot turn on aides'

devices, organizers' private motives, later archiving decisions, or whether the government paid for the event. That approach would expose Presidents to liability based on facts beyond their knowledge and control and eviscerate Presidential immunity.

I.D. The President's other election-integrity communications are immune as well. The Court need not reach them because Plaintiffs' claims rise or fall with the Ellipse Speech. Having said that, President Trump's tweets and communications with federal, state, and local officials likewise concerned the Vice President's duties, federal law enforcement, recounts, and certification—subjects squarely within a President's official responsibilities.

II. The First Amendment independently bars the claims. The Ellipse Speech was core political advocacy: the President addressed citizens about the operation of government and urged them to make their views known to Congress. It expressly called for supporters to march "peacefully and patriotically" and never called for violence.

II.A. There is no free-floating doctrine of "implicit incitement." Incitement turns on the words the speaker actually used, and the words President Trump used did not incite. The district court acknowledged

that President Trump never explicitly encouraged violence or lawlessness, yet the court erroneously inferred an unspoken command from surrounding allegations and supposed audience characteristics. No Supreme Court or federal appellate decision has sustained incitement on that basis.

II.B. Even if implicit incitement were cognizable, which it is not, it must be the speech's only reasonable meaning. *Fed. Election Comm'n v. Wisconsin Right to Life*, 551 U.S. 449 (2007), forbids treating protected political speech as the functional equivalent of prohibited speech while any other reasonable lawful interpretation remains. *Counterman v. Colorado*, 600 U.S. 66 (2023), reinforces that rule: intent requirements protect speech; they do not permit courts to manufacture an inciting command absent from the words themselves. Because the Ellipse Speech is reasonably understood as peaceful political advocacy, dismissal was required.

II.C. Peaceful political advocacy is not merely a reasonable interpretation of the President's Speech; it is the best and only reasonable one. The statements the district court wrongly deemed to be inciting referred to congressional objections, political pressure, elections, and

primary challenges. In reality, the Speech repeatedly instructed supporters to walk, cheer for lawmakers, demand congressional action, and make their voices heard peacefully and patriotically. It never instructed anyone to commit any violence whatsoever. Nor can later private remarks or subsequent events supply a command the Speech never contained.

The Court should reverse.

## STANDARD OF REVIEW

The President's immunity is a pure question of law, subject to de novo review. *Blassingame*, 87 F.4th at 12.

The denial of the President's motion to dismiss on First Amendment grounds is also subject to de novo review. *King v. Jackson*, 487 F.3d 970, 972 (D.C. Cir. 2007); *Tavoulareas v. Piro*, 817 F.2d 762, 776 (D.C. Cir. 1987) (First Amendment challenges require an "independent examination of the whole record").

## ARGUMENT

### I. The Claims Against President Trump Are Barred by Presidential Immunity.

The President enjoys "absolute immunity from damages liability predicated on his official acts." *Nixon v. Fitzgerald*, 457 U.S. 731, 749

(1982). He is "the only person who alone composes a branch of government." *Trump*, 603 U.S. at 610. Powers that broad demand equally broad protection, preserving the President's "maximum ability to deal fearlessly and impartially with the duties of his office." *Fitzgerald*, 457 U.S. at 752 (internal quotation marks omitted). Otherwise, liability and protracted litigation would leave him "chilled from taking the bold and unhesitating action required of an independent Executive." *Trump*, 603 U.S. at 613 (internal quotation marks omitted).

The inquiry "begins with assessing the President's authority to take that action." *Trump*, 603 U.S. at 617. At the center of that authority lie the powers the Constitution commits to him alone. When he acts on his "own constitutional powers," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring), he is absolutely immune from civil liability and criminal prosecution, *Trump*, 603 U.S. at 607.

Immunity reaches the "outer perimeter" of the President's official responsibilities. *Trump*, 603 U.S. at 618. It covers every act "not manifestly or palpably beyond [his] authority." *Id.* That protection is "capacious by design," *Blassingame*, 87 F.4th at 12, and so the Court has

"refused to draw functional lines finer than history and reason would support," *Fitzgerald*, 457 U.S. at 755. Motive and legality therefore play no part in this analysis. Once the President invokes his authority, "courts may not inquire into the President's motives," nor may liability rest on the conduct's alleged illegality. *Trump*, 603 U.S. at 618–619. Indeed, the President's immunity is so broad that a jury may not "probe official acts for which the President is immune," and evidence of official acts cannot be used against the President as proof regarding conduct which occurred before or after he took office. *Id.* at 631.

The President's immunity burden is a light one. At summary judgment he need show only that, on the undisputed facts, his conduct *can* reasonably be understood as official. *Blassingame*, 87 F.4th at 21–22. Plaintiffs face the mirror image: they prevail only if the conduct may "reasonably be understood only as re-election campaign activity." *Id.* If the assessment "yields no sufficiently clear answer in either direction, the President … should be afforded immunity." *Id.* at 21.

Here, two independent grounds make the President's Ellipse Speech absolutely immune. *First*, the Ellipse Speech was an exercise of his constitutional recommendation power. *Second*, his communications

fall within the outer perimeter of his bully-pulpit power to speak to the Nation in ways that he decides advance the public interest—including in a speech delivered over two months after the Presidential Election, addressing irregularities in that election and ways to secure elections going forward.

### A. The Ellipse Speech Was an Exercise of the Recommendations Clause.

This Court in *Blassingame* did not previously consider whether the Ellipse Speech was an exercise of the President's core recommendation power. The question is now squarely and properly presented, and the answer is "yes."[8]

Article II commands that the President "shall from time to time … recommend to [Congress's] Consideration such Measures as he shall judge necessary and expedient." U.S. Const. art. II, § 3. That phrasing was deliberate. An early Convention draft used the permissive "may," but on Gouverneur Morris's motion, the Framers struck "may," and inserted "shall." Chad Squitieri, *"Recommend … Measures": A*

[8] The Recommendations Clause argument is properly before this Court because it was raised, litigated, and decided below. *Lilly v. District of Columbia*, 657 F. Supp. 3d 65, 85 (D.D.C. 2023); Fed. R. Civ. P. 12(g)(2).

*Textualist Reformulation of the Major Questions Doctrine*, 75 Baylor L. Rev. 706, 752–53 (2023) (quoting J. Madison, Notes of Debates in the Federal Convention of 1787, at 526 (G. Hunt & J. Scott eds., 1987)). Vitally, James Madison explained that the change was made "in order to make it the duty of the President to recommend, & thence prevent umbrage or cavil at his doing it." *Id.*

Founding-era authorities describe the Recommendations Clause as requiring the President to identify a public problem ("point out the evil") and "suggest the remedy" to Congress. 3 Joseph Story, Commentaries on the Constitution § 1555, 412–13 (1833); 1 St. George Tucker, Blackstone's Commentaries app. at 344 (1803) ("[T]he constitution has made it the duty of the supreme executive functionary, to lay before the federal legislature, a state of such facts as may be necessary to assist their deliberations.").

The Ellipse Speech was thus a clear and direct exercise of the President's authority, under the Recommendations Clause, to propose measures to Congress, and to do so free from any "umbrage or cavil." On the morning of Congress's joint session, the President laid before it his account of the 2020 election, urged it to count only the electors he

regarded as lawfully appointed, and called for sweeping electoral reforms. Because the Speech can "be neatly categorized as falling within a particular Presidential function," it is immune, this case must be terminated, and the "umbrage or cavil" brought to an end. *Trump*, 603 U.S. at 628.

The President began by identifying "the evil." The bulk of the President's remarks was a State-by-State presentation of what he described as evidence of voting irregularity and fraud in Pennsylvania, Georgia, Wisconsin, Michigan, Arizona, and Nevada. Sp. 15–17, 19–27. He described "illegal, unmanned, unsecured drop boxes," a "vote dump of up to 100,000 votes," "one-sided vote dumps," and a "93.67 percent error rate." Sp. 20–26. In the President's judgment, and that of many other public officials and experts on these issues, the result of all this was "the most corrupt election" for the Nation's highest office. Sp. 28.

Then came the President's recommended "remedy." The President observed that it was "up to Congress to confront this egregious assault on our democracy," and urged that "Congress do the right thing and only count the electors who have been lawfully slated." Sp. 8–9. More than *a dozen times*, the President appealed to Congress, praised it, or faulted it

for failing to act. Sp. 8–12, 18–20. He praised "more than 140 members of the House," calling them "warriors." Sp. 11. The President addressed the Vice President in his capacity as President of the Senate *nine times*, repeatedly urging him to "send [electors] back." Sp. 4, 18. He named *18 Senators and Representatives*. All of this served the key recommendation: that Congress "stand strong for the integrity of our elections" and send back unlawful electors. Sp. 9.

The Ellipse Speech also recommended to Congress a package of election-integrity legislation. The President called on Congress to "quickly pass sweeping election reforms," including (i) to "require proof of American citizenship in order to vote in American elections"; (ii) to "ban ballot harvesting and prohibit the use of unsecured drop boxes"; (iii) to "stop the practice of universal unsolicited mail-in balloting"; (iv) to "clean up the voter rolls"; and (v) to "restore the vital civic tradition of in-person voting on Election Day." Sp. 28–29.

These recommendations were all constitutional "Measures," U.S. Const. art. II, § 3, because each was a solution to a condition the President identified. *See* Samuel Johnson, A Dictionary of the English Language (1755) (defining "measure" as a "[m]ean of action; mean to an

end"); J. Gregory Sidak, *The Recommendation Clause*, 77 Geo. L.J. 2079, 2084 (1989) ("'measure' connotes the formulation of a proposed solution to an identified condition").

"Measures" are not limited to proposed legislation, as the district court conceded. The Constitution's deliberate word choice confirms as much. Article I speaks of "legislation," of "Bills," and of the making of "Laws." U.S. Const. art. I, §§ 7, 8, 9. The Recommendation Clause, by contrast, speaks more broadly of "Measures." U.S. Const. art. II, § 3. "To disregard such a deliberate choice of words," the Supreme Court explained, "would be a departure from the first principle of constitutional interpretation." *Wright v. United States*, 302 U.S. 583, 588 (1938); *Pulsifer v. United States*, 601 U.S. 124, 149 (2024) ("In a given statute, the same term usually has the same meaning and different terms usually have different meanings.").

The Recommendations Clause also leaves the form of a recommendation to the President's discretion. *See* C. Ellis Stevens, Sources of the Constitution 158–59 n.2 (1894) (Article II "does not prescribe the form in which the President shall present the measures"). The President may therefore communicate a recommendation in

whatever form he chooses—personally, through a written message, or, as here, in a public address designed to enlist support for congressional action.

Indeed, Presidents for centuries have enlisted the public to press Congress in service of their recommended measures. For example, President Ronald Reagan urged citizens to contact Congress about tax cuts; President Bill Clinton urged citizens to tell Congress to support his anticrime legislation following a procedural defeat; President George W. Bush urged citizens to call in support of creating the DHS; and President Barack Obama urged voters to press for health-care reform.[9] President Trump acted in that tradition when he asked supporters to march "peacefully and patriotically," cheer on lawmakers, and give wavering Republicans "pride and boldness."

---

[9] *See* George W. Bush, Radio Address by the President to the Nation, 2 Pub. Papers 1629, 1629 (Sept. 21, 2002); Reagan, Address to the Nation on Federal Tax Reduction Legislation, Pub. Papers 664, 665–68 (July 27, 1981); Franklin D. Roosevelt, Fireside Chat Discussing the Plan for Reorganization of the Judiciary, 1 Pub. Papers 122, 122–33 (Mar. 9, 1937); Clinton, Remarks Upon Arrival in Detroit, Michigan, 2 Pub. Papers 1442, 1444–45 (Aug. 6, 1994); Obama, Remarks at Rally for Governor Jon Corzine, 2 Pub. Papers 1117, 1121 (July 16, 2009).

The President also deemed his recommendations "necessary and expedient" to achieve his stated aims. U.S. Const. art. II, § 3. He explained that election integrity was "not just a matter of domestic politics" but "a matter of national security." Sp. 28. The President spoke in his singular role as Chief Executive, in terms far broader and more pointed than a candidate for office (the Election having taken place on November 3, over two months earlier), urging that "it is up to Congress to confront this egregious assault on our democracy." Sp. 8. Speaking on behalf of the Nation, the President told Congress that his purpose was "for one very, very basic and simple reason: to save our democracy." Sp. 6.

The district court wrongly rejected the Recommendation Clause on the flawed theory that a recommendation must resemble the State of the Union. Op. 20. That was error. The Framers intentionally separated the two clauses (originally coupled), confirming "the President can make recommendations outside of the limited State of the Union setting." Chad Squitieri, *The Recommendation Clause*, *in* The Heritage Guide to the Constitution 408 (Josh Blackman & John G. Malcolm eds., 3d ed. 2025) (citing 2 The Records of the Federal Convention of 1787 129, 137, 145 (Max Farrand ed., 1911)).

The district court was also wrong to analogize the Recommendations Clause to the Take Care Clause. Op. 20. The Recommendations Clause commands one discrete function—recommending measures to Congress. Whether the President exercised it is answered by what he said, when he said it, and to whom: on the day of the joint session, the President addressed a pending congressional proceeding, proposed federal election reforms, and asked Congress to act. President Trump clearly acted on his Recommendations Clause duties in delivering the Ellipse Speech.

* * *

Because the Ellipse Speech exercised an enumerated Article II power (in this case under the Recommendations Clause), the immunity inquiry is over. *Trump*, 603 U.S. at 606. The Constitution commits to the President the judgment on what measures to recommend, when to recommend them, and how to communicate and advance those recommendations. Where, as here, the President performs the very function Article II commands him to perform, his immunity "is absolute[]." *Id.* This case should be put to an end for this reason alone.

### B. The Ellipse Speech Is Also Official Under the President's Bully Pulpit Power.

The Ellipse Speech is also immune on a second, independent ground: it was an exercise of the President's recognized bully-pulpit authority and, at a minimum, falls within the outer perimeter of the President's official-responsibilities.

The President "possesses an extraordinary power to speak to his fellow citizens and on their behalf." *Trump v. Hawaii*, 585 U.S. 667, 701 (2018). Theodore Roosevelt called it the "bully pulpit," and the Supreme Court has taken up the phrase, describing it as "a long-recognized aspect of Presidential power." *Trump*, 603 U.S. at 629. The President must also "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and those laws include the federal prohibitions on election crime. "As the sole person charged by the Constitution with executing the laws of the United States, the President oversees—and thus will frequently speak publicly about—a vast array of activities that touch on nearly every aspect of American life." *Trump*, 603 U.S. at 629.

The Supreme Court in *Trump* and this Court in *Blassingame* each supplied a framework for deciding when a President's public communications fall within that perimeter. The frameworks differ—and

where they differ, the Supreme Court's test must control—but here they produce the same result. Under both *Trump and Blassingame*, the Ellipse Speech can be reasonably viewed as an exercise of the President's vast speech powers, was therefore an official act, and is subject to absolute immunity.

### 1. The Ellipse Speech Is Official Presidential Speech under *Trump v. United States*.

"Most of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities." *Trump v. United States*, 603 U.S. at 629. When a President speaks to the American people "in ways that the President believes would advance the public interest," the ordinary answer is that he is acting officially. *Id.* The President "is even expected to comment on those matters of public concern that may not directly implicate the activities of the Federal Government." *Id.* The Court drew the perimeter widely because a President anticipating years of civil litigation over his public statements would be "chilled from taking the bold and unhesitating action required of an independent Executive," which would cripple the Presidency. *Id.* at 613 (internal quotation marks omitted).

*Trump* recognized no firm exception to this powerful official-act presumption. It allowed only that "[t]here *may* … be contexts in which the President, notwithstanding the prominence of his position, speaks in an unofficial capacity—*perhaps* as a candidate for office or party leader." *Id.* at 629 (emphases added); *see also id.* at 668 (Sotomayor, J., dissenting) (acknowledging that, under *Trump*, the scope of any residual category of non-immune speech is "vanishingly small"). "To the extent that may be the case," the Court explained, "content, form, *and* context" should guide whether a particular speech falls outside the President's broad remit. *Id.* (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). Specifically, courts must consider "what else was said contemporaneous to the excerpted communications," along with contextual facts such as "who was involved in transmitting the electronic communications and in organizing the rally." *Id.* at 630.

Content is powerful evidence of official conduct. In *Snyder*, for example, the Court held the speech protected because its "*overall thrust and dominant theme*"—*i.e.*, its content—"spoke to broader public issues." 562 U.S. at 454. That same framework governs here.

Under *Trump*'s framework, the Ellipse Speech *can* reasonably be viewed as the President speaking in his official capacity, not merely as a candidate. The subject of the Ellipse Speech was the integrity of a national election that occurred over two months prior, and a dominant theme of the Speech was pressing Congress to act on a certification proceeding involving more than 150 million voters. Another key theme was a call for specific election integrity reform for elections in the future. The President told Congress and the Nation that "[n]ow it is up to Congress to confront this egregious assault on our democracy" and that "[w]e have come to demand that Congress do the right thing and only count the electors who have been lawfully slated." Sp. 8–9.

The President also pressed the Vice President on his official duties as Senate President. "All Vice President Pence has to do is send it back to the states to recertify," he said, adding: "Mike Pence, I hope you're going to stand up for the good of our Constitution and for the good of our country." Sp. 4–5, 22. Importantly, the Supreme Court held that a President's efforts to "pressure the Vice President to take particular acts in connection with his role at the certification proceeding" are official conduct. *Trump*, 603 U.S. at 623. That the President did so in public from

the bully pulpit makes it more visibly official, not less; public persuasion is itself a function of the office, and nothing in *Trump* suggests a communication becomes unofficial simply because it is delivered from a podium rather than the Oval Office. (*Contra* Op. 20).

A viewer hearing this speech could—and would—easily conclude its "dominant theme" is official. *Snyder*, 562 U.S. at 454. The President addressed the audience not as voters, especially since voting had closed months before, but as "American patriots who are committed to the honesty of our elections and the integrity of our glorious Republic." Sp. 3. The President framed his subject as "not just a matter of domestic politics" but "a matter of national security," and called for prospective, generally applicable reforms reaching well beyond the specific election at issue. Sp. 28–29.

The context and setting further confirm the speech's official character. A viewer watching the nationally televised address would have seen the President standing on federal ground, with the White House at his back, behind the Seal of his office, speaking to Congress and the Vice President about a congressional proceeding about to begin several blocks away.

The behind-the-scenes record reinforces that conclusion. The Speech was circulated on the evening of January 5 through official White House channels to White House personnel. Op. 23–24. Unlike the President's remarks in Dalton, Georgia two days earlier, the Ellipse Speech draft carried no Hatch Act notice—and the Deputy White House Counsel did not require one. Op. 21–25. The stage location was also fixed at the "desire of the White House and the President," and was made possible only by a waiver request through official governmental channels: from the White House Deputy Chief of Staff to the National Park Service. Op. 26.

The President need show only that his conduct "can reasonably be understood as the official actions of an office-holder"—not that this is the only, or even the best, reading, which it is here. *Blassingame*, 87 F.4th at 21–22, 30. This record does not leave this question open. The President's address to the Nation just prior to the beginning of congressional certification is not "manifestly or palpably beyond" his authority. *Trump*, 603 U.S. at 618. The Ellipse Speech was clearly official.

### 2. Under *Blassingame*, too, the Ellipse Speech Can Reasonably Be Viewed as Official.

*Blassingame* distinguished between the President acting as office-holder and the President acting as office-seeker. 87 F.4th at 18. *Trump v. United States* did not adopt *Blassingame*'s view of Presidential speech. It did not hold that a President's speech becomes unofficial whenever he speaks as an "office-seeker," nor that context may strip an incumbent's speech of its official character. 603 U.S. at 629. The Supreme Court in *Trump* instead described the President's bully-pulpit powers with maximum breadth, directed courts to consider "content, form, *and* context" of Presidential speech in deciding whether it is official, and stressed that "most of a President's public communications" are official. *Id.* *Trump* thus supplies the governing framework, and under it, as already explained, the Ellipse Speech is clearly official—and this case should have been dismissed early on.

In any event, under the summary judgment record, *Blassingame* too requires that this case come to an end. *Blassingame* drew its line at speech undertaken "strictly" and exclusively as an office-seeker. 87 F.4th at 19. That is a narrow category, because "there is not always a clear line between the President's personal and official affairs," *id.* at 20 (quoting

*Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020)), and Presidents "routinely take political considerations into account in their official acts," *id.* at 32 (Katsas, J., concurring). Accordingly, the relevant question is not whether a President was also a candidate, or whether political considerations attended his speech, but whether he was speaking "strictly" in his capacity as a candidate for office such that the speech cannot "reasonably be understood" as official. *Id.* at 19, 21–22.

*Blassingame*'s own examples show how demanding this Court understood that standard to be. Its first example involved litigation that the President's counsel had referred to as personal. *Id.* at 15–16. The remaining examples share that same defining feature: each occurs in a forum the speaker occupies only because he is a candidate. A nominee gives an acceptance speech at a party convention or appears on a debate stage "only if he seeks and wins the party's nomination—or else some other person will give the same speech." *Id.* at 18. The same is true of "a campaign rally fully funded by [his] campaign committee," *id.* at 21, or a "campaign ad fully funded by [his] campaign," *id.* at 18. Remove the candidacy, and the speech itself disappears. Under *Blassingame*, that is what makes such speech possibly unofficial "by nature." *Id.* at 21.

The Ellipse Speech bears none of those hallmarks of strictly campaign speech. Far from disclaiming official capacity, the President spoke as President—addressing the Vice President and Congress about an imminent congressional proceeding and the integrity of the Nation's election process. The Campaign did not organize or sponsor the rally. As the district court itself recognized, the asserted campaign involvement rested on "roles played by multiple former campaign employees … not on persons then employed or hired by the Campaign." Op. 37.

Nor was the Ellipse a forum available to the President "strictly" because he was a candidate. *Blassingame*, 87 F.4th at 19. Women for America First organized the event to "have our voices heard," and to "put pressure on the Senators" not to certify results it believed were fraudulent. Op. 28–29. Nothing about that purpose depended on President Trump being the candidate. Had another candidate been on the ballot instead, the organizers' objective—and their reason for seeking presidential intervention—would have been the same. A President who believed a national election had been corrupted would have reason to address the Nation regardless of whose name appeared on the ballot. That is why, even in 2026, without his own candidacy at stake, President

Trump continues to press Congress for similar election-integrity reforms such as the SAVE America Act,[10] and continues to address the Nation on much-needed election reform, due to a long history of extensive election irregularities, in 2020 and otherwise.[11] The Ellipse Speech thus turned not on President Trump's status as a candidate, but on his stated, extensive views that the election had been marred by serious irregularities and his responsibility as President to address that threat, which he assessed to be a matter of "national security." Sp. 28.

The Ellipse Speech was, in important respects, the opposite of a campaign speech—because it was a speech that only a sitting President could give. President Trump spoke from the perspective of the incumbent Administration, invoking governmental acts that only a President could claim as his own—including rebuilding the military, securing tax and regulatory changes, and creating the Space Force. The President addressed his Vice President concerning Pence's constitutional

---

[10] *See, e.g.*, The White House, *The SAVE America Act Is the Most Popular Election Reform in Decades* (Mar. 12, 2026).

[11] President Donald J. Trump, *Address to the Nation on Election Reforms*, Daily Comp. Pres. Docs., 2026 DCPD No. 000469 (July 16, 2026).

responsibilities as President of the Senate, pressed Congress to act in an imminent federal proceeding, characterized election integrity as "a matter of national security," and proposed prospective reforms to federal law extending well beyond his own candidacy. Indeed, the forum itself was available to him because he was President: the Deputy Chief of Staff helped secure the permit from the National Park Service, an avenue that would not have been available to a private candidate. Those features of the Speech—including its location, setting, and presentation—depended on the office he then occupied, not merely the office he sought to retain. The Speech therefore cannot reasonably be classified as one given "strictly" in the capacity of a candidate. *Blassingame*, 87 F.4th at 19.

The district court found an irrelevant sliver of campaign involvement only by relying on inadmissible evidence. It concluded that the Campaign funded a small portion of the rally equipment based on an admission in the Campaign's answer in *Smith v. Trump*, treating that statement as a party-opponent admission under Federal Rule of Evidence 801(d)(2). Op. 36 & n.13. But Rule 801(d)(2) applies only when a statement is "offered against" the party who made or authorized it. The statement was made by the Campaign and offered against President

Trump—a separate defendant who objected to its admission. Def.'s Counterstmt. ¶ 204. *See Dyer v. McCormick & Schmick's Seafood Rests., Inc.*, 264 F. Supp. 3d 208, 240 (D.D.C. 2017) (a statement "may not be admitted … against another party on the same side of the litigation"). Without that evidentiary error, even the district court's limited finding of campaign funding falls away.

The bottom line is that under *Blassingame*'s (non-controlling) framework as well, the Ellipse Speech was official. *Blassingame* held no more than that the Speech "might" be unofficial, and it said that only on a motion to dismiss, where it had to "assume the truth" of Plaintiffs' allegation that the rally "was organized and funded by Trump's campaign organization." 87 F.4th at 5, 30. That allegation "has not panned out," Op. 40, and so this record cannot support the conclusion that the Speech, "viewed objectively and in context[,] may reasonably be understood *only* as re-election campaign activity." *Blassingame,* 87 F.4th at 21–22 (emphasis added). At the very least, the lack of campaign involvement, and the White House participation, means the assessment "yields no sufficiently clear answer in either direction"—and in that circumstance "the President … should be afforded immunity." *Id.* at 21.

### C. The District Court's Contrary Reasoning Is Wrong.

The district court's contrary reasoning rests on two independently fatal errors. *First*, the court wrongly denied immunity based on contextual factors the President cannot have known when he spoke, defeating the very purpose immunity serves. *Second*, the district court invented an "official-trappings" requirement, which neither this Court in *Blassingame* nor the Supreme Court in *Trump* has ever endorsed.

**1.** Immunity must be knowable to the President at the moment he acts. In recognizing absolute immunity, the "dominant concern" has been to avoid the "diversion of the President's attention during the decision making process caused by needless worry as to the possibility of damages actions." *Trump*, 603 U.S. at 611 (quoting *Clinton v. Jones*, 520 U.S. 681, 694 n. 19 (1997)). A President forced to reckon with the private conduct of third parties—or with events that have not yet occurred—cannot take the "bold and unhesitating action" the office demands. *Fitzgerald*, 457 U.S. at 745. This principle mirrors qualified immunity's *ex ante* structure: an official's immunity turns on the facts known to him when he acted. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (courts must judge reasonableness "from the perspective of a reasonable officer on the scene,

including what the officer knew at the time, not with the 20/20 vision of hindsight").

The district court thus erred in allowing immunity to turn on many, largely minute, contextual details the President could not have known when he spoke. For example, it wrongly relied on the fact that an early draft of the Speech was composed on a White House speechwriter's personal device, Op. 24; that a private organization's leaders hoped to accomplish certain results, Op. 28–29; that the White House Director of Social Media used a personal email address in coordinating the broadcast, Op. 38; and that the private donor who underwrote the event had made a large donation to a PAC supporting the President's reelection, Op. 32. None of those factors are material under the official-acts and presidential immunity framework.

The district court's analysis then descended from context into trivia. It pointed to a guidance memo that listed four people rally attendees could contact with questions, and deemed the Speech unofficial because none of them worked for the executive branch (though none worked for the campaign either). It even weighed "invoices" that two workers had submitted referencing January 6. Op. 37 n.14. There is no

evidence—none—that the President would be aware of these granular details.

Most indefensibly, the court held the President responsible for facts that did not even exist when he spoke. It faulted him because the campaign social media accounts posted clips of the Speech afterward; because the White House website did not later publish the remarks to whitehouse.gov or archive the video on its YouTube channel; and because two of the speakers were later paid by a private organization. Op. 33–34. To condition immunity on events that unfolded only after the President left the podium turns the doctrine on its head and cannot be squared with controlling precedent.

If left standing, the district court's analysis will inflict lasting damage on the Presidency. It would force Presidents to police an entire universe of facts beyond their knowledge and control before speaking or acting. That, in turn, would make it impossible for the President to "reasonably anticipate when [his] conduct may give rise to liability for damages." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). That is precisely the "diversion of [Presidential] attention" and "needless worry"

that immunity seeks to prevent. *Trump*, 603 U.S. at 611 (quoting *Clinton*, 520 U.S. at 694 n.19).

The closest immunity precedents clearly foreclose the district court's sprawling context-only approach. *Trump v. United States* makes the President's own words and conduct—not a post hoc excavation of third parties' private acts and later events—the focus of the immunity inquiry. 603 U.S. at 617–19, 629–30. *Blassingame*, too, did not require the district court's freewheeling analysis, much less require extensive discovery to determine whether a President's speech is official or not; it asked only whether the President's conduct "can reasonably be understood as the official actions of an officeholder." 87 F.4th at 30. Nothing in either decision authorizes immunity to turn on discovery into private devices, personal email accounts, donor relationships, invoices, or events occurring after the President spoke. The district court's reliance on such immaterial factors was error and must be reversed.

**2.** The district court then compounded its contextual errors with a second error: it invented an "official trappings" requirement found nowhere in the law. The court declared the Ellipse Speech unofficial because it was not "clothed in the trappings of an official function"—by

which the court meant that the White House had not paid for, organized, or funded the event. Op. 30, 42. In this way, the court not only wrongly ignored the speech's content; it also wrongly elevated White House funding, staff orchestration, and publication on official channels into indispensable conditions of immunity. The district court made that error while overlooking the official trappings that were present: the Speech was circulated through official White House channels, and the President delivered it from behind the presidential seal, on federal ground, with the White House as the backdrop. Op. 23–24, 26.

No precedent imposes any such requirement. *Trump* directs courts to examine "what else was said contemporaneous to the excerpted communications." 603 U.S. at 630. And *Blassingame* asks only whether conduct, "viewed objectively and in context," may reasonably be understood *only* as re-election campaign activity. 87 F.4th at 21. *Blassingame*'s later discussion of White House funding and organization was meant to illustrate context that makes immunity "more likely"; it was not a checklist of mandatory elements. *See id.*

Private venues and private sponsors have never stripped an incumbent President's remarks of their official character. President

Reagan spoke on judicial appointments and abortion legislation at the March for Life; President Obama on Iran policy at AIPAC; and Presidents of both parties at the National Prayer Breakfast.[12] None of those addresses could "reasonably be understood only as re-election campaign activity." *Blassingame*, 87 F.4th at 21–22. To the contrary, "most of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities." *Trump*, 603 U.S. at 629.

The district court thus erroneously turned the governing inquiry upside down. It wrongly treated the absence of government funding or official-channel publication as dispositive, while brushing aside the Speech's content, the lack of any campaign involvement, and its delivery from behind the presidential seal, near the White House, and on the eve of Congressional certification. A President answering a reporter's question about a foreign war during a weekend at his private residence

---

[12] *See* Ronald Reagan, Remarks to Participants in the March for Life Rally, 1 Pub. Papers 74, 75–76 (Jan. 22, 1988); Barack Obama, Remarks at AIPAC Policy Conference, 1 Pub. Papers 249, 251–54 (Mar. 4, 2012).

would, on the district court's incorrect view, be acting unofficially—an absurd result that exposes the "clothed in trappings" test as unworkable.

Because the district court's decision rests on unknowable contextual factors and on an unprecedented "official-trappings" test, it cannot stand. The Court should reverse.

### D. President Trump's Other Communications and Actions on Election Integrity Also Fall Within the Outer Perimeter of His Official Responsibilities.

Because this case turns on the Ellipse Speech, the Court need not reach the President's earlier communications. The district court held that all of President Trump's election-integrity communications lose First Amendment protection "only if" they meet "the stringent *Brandenburg* 'incitement' standard." *Thompson v. Trump*, 590 F. Supp. 3d 46, 110 (D.D.C. 2022). Plaintiffs pressed that standard for the Ellipse Speech alone. *See id.* at 113; *see also* Op. 58. They never argued that the President's earlier tweets or his calls with state officials fall within *Brandenburg*'s exception. They have thus forfeited the argument and conceded that all non-Ellipse speech is protected by the First Amendment. *See Colindres v. U.S. Dep't of State*, 71 F.4th 1018, 1025

(D.C. Cir. 2023) (a party forfeits an argument by failing to address it in an opposition to a motion to dismiss).[13]

The Court therefore need only analyze the Ellipse Speech to reverse and direct the district court to enter judgment for President Trump. Nevertheless, even if the Court reaches the President's earlier communications, those too are official. Each falls within the outer perimeter of the President's responsibilities.

***Tweets.*** The President's tweets on election integrity are official by virtue of their content under the Supreme Court's *Lindke* decision. *See Lindke v. Freed*, 601 U.S. 187, 203 (2024) (holding in the state-action context that a social media post's "content and function are the most important considerations"). One declared: "The Vice President has the power to reject fraudulently chosen electors." Def.'s Counterstmt. ¶ 45.

---

[13] Even had Plaintiffs not waived the argument, *Brandenburg's* strict imminence prong bars imposing liability based on statements predating January 6. *National Ass'n for the Advancement of Colored People v. Claiborne Hardware Co.*, 458 U.S. 886, 928 (1982) (holding speech protected under *Brandenburg* where, except for one incident, "the acts of violence identified in 1966 occurred weeks or months after the April 1, 1966, speech").

Another: "The Vice President and I are in total agreement that the Vice President has the power to act." Def.'s Counterstmt. ¶ 46. A third: "The 'Justice' Department and the FBI have done nothing about the 2020 Presidential Election Voter Fraud, the biggest SCAM in our nation's history, despite overwhelming evidence." Def.'s Counterstmt. ¶ 40. Pressing the Vice President and Executive Branch agencies to act is official conduct, full stop. *Trump*, 603 U.S. at 623. Most of the rest of the tweets addressed fraud in a national election, which is exactly the kind of subject the President is "even expected to comment on." *Trump*, 603 U.S. at 629.

The surrounding context bears this out. Day in and day out, the President used the Twitter account to announce and defend his policies and agenda. The White House Press Secretary announced that its posts were "official statements by the President of the United States." MSJ Ex. 2 at 231; Op. 50–51. The White House Director of Social Media helped run it. *Id.* at 232; Op. 51. The account carried the President's official title, federal agencies monitored it for official messages, and the National Archives preserved its tweets. Op. 50–51.

The district court wrongly held otherwise. It would ludicrously deem no tweet official unless the President supplied "his location at the time of the tweet," and "who else was present." Op. 49. That test reads content out of the inquiry, and it violates the rule that "most of a President's public communications" fall within the broad sweep of his speech powers. *Trump*, 603 U.S. at 629.

It also produces absurd results. On the district court's incorrect view, a President who tweets about national affairs from a meeting held at a hotel would be acting unofficially. So would one who asked a campaign staffer to hit "send." The tweets' content therefore remains highly probative, particularly because each is a short, self-contained communication. The tweets at issue were all official acts.

***Outreach to Local Officials.*** The President's communications with state and local officials about election integrity are official for the same reason. "The President may speak on and discuss [the fairness and integrity of federal elections] with state officials—even when no specific federal responsibility requires his communication—to encourage them to act in a manner that promotes the President's view of the public good." 603 U.S. at 627. The district court itself agreed that such contacts can be

official: it held that the November 20, 2020 Oval Office meeting with Michigan legislators was an official act. Op. 46–47. The other calls and discussions are no different: each concerned recounts, certification, and the accuracy of the national vote, and each is absolutely immune.

* * *

Presidential immunity is meant to prevent not only liability, but the "diversion of the President's attention" and "needless worry" that litigation itself imposes. *Trump*, 603 U.S. at 611 (quoting *Clinton*, 520 U.S. at 694 n.19). Yet, these cases have already wrongly caused years of motions, appeal, remand, and discovery into the President's official speech. Because the Ellipse Speech and the President's other election-integrity communications fall within the outer perimeter of his official responsibilities, the denial of immunity should be reversed and the claims against him dismissed.

## II. The First Amendment Independently Bars the Claims Against President Trump.

In addition to being absolutely immune, the Ellipse Speech is protected by the First Amendment because it does not come close to satisfying the demanding standard for incitement. President Trump addressed citizens about "the manner in which government … should be

operated," *Mills v. Alabama*, 384 U.S. 214, 218 (1966), urging them to make their views known to Congress. That is "more than [mere] self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964).

The First Amendment protects against not only ultimate liability, but also "the harassment of lawsuits," because litigation itself "may be as chilling to the exercise of First Amendment freedoms as fear of the outcome," especially for "advocates of unpopular causes." *Wash. Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966). That is why "[t]he inquiry into the protected status of speech is one of law, not fact," *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983), and courts "must make an independent examination" to ensure a claim "does not constitute a forbidden intrusion on the field of free expression," *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 n.50 (1982) (internal quotation marks omitted).

The district court nevertheless wrongly exposed the President to expensive civil litigation and liability for that speech based on a strained theory of "incitement by implication." *Thompson*, 590 F. Supp. 3d at 115; Op. 59. That was also clear, grievous error.

Incitement is one of the few "historic and traditional categories" of unprotected expression. *Counterman v. Colorado*, 600 U.S. 66, 73 (2023). Its boundaries have been intentionally "well-defined and narrowly limited." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942). Speech is unprotected incitement only if it is (1) "directed to inciting or producing imminent lawless action," (2) "likely to incite or produce such action," and (3) uttered with the specific intent to bring about that result. *Brandenburg*, 395 U.S. at 447; *Counterman*, 600 U.S. at 76, 81. Each requirement is deliberately exacting because incitement lies just "a hair's-breadth" from protected political advocacy, and a looser rule would "bleed over" into "political speech at the First Amendment's core." *Counterman*, 600 U.S. at 81. For that reason, the First Amendment safeguards even the most "vehement, caustic, and … unpleasantly sharp attacks on government and public officials." *Watts v. United States*, 394 U.S. 705, 708 (1969) (quotation omitted).

The Ellipse Speech lies within the heartland of First Amendment protection and comes nowhere close to the "well-defined and narrowly limited" boundaries of incitement. That is so for at least three independent reasons: *First*, as the district court recognized, the Speech

never explicitly called for violence, and the First Amendment recognizes no separate exception for "implicit incitement." *Second*, if "implicit incitement" is cognizable at all, which it is not, liability is unavailable whenever the speech admits a reasonable protected interpretation. *Third*, peaceful political advocacy is not merely a reasonable reading of the Speech, but its best—and only reasonable—reading.

### A. There Is No "Implicit Incitement" Exception to the First Amendment.

The district court acknowledged that the Ellipse Speech "did not explicitly encourage the imminent use of violence or lawless action," yet wrongly held that it plausibly conveyed "an implicit call for imminent violence or lawlessness." Op. 63–64. That was error. The Court's amorphous theory of "implicit incitement" has no place within the "well-defined" walls of the "narrowly limited" incitement exception.

*First*, incitement doctrine focuses on the language the speaker actually used, while "incitement by implication" does the opposite. "It is the words used by the speaker that must be at the focus of the incitement inquiry." *Nwanguma v. Trump*, 903 F.3d 604, 611, 613 (6th Cir. 2018) (no incitement "unless the words used *specifically advocated* the use of violence" (emphasis added)); *see also Herceg v. Hustler Mag., Inc.*, 814

F.2d 1017, 1021–23 (5th Cir. 1987) ("The text" of the challenged speech "provides the best basis" for determining incitement). However, under the guise of implication, the court improperly shifted from what President Trump actually said to an amorphous and inherently political inquiry into whether he had created an "air of distrust and anger" and whether he "actively monitored" his supporters' websites in the weeks prior for inclination to violence. *Thompson*, 590 F. Supp. 3d at 115–17. That methodology—"incitement by implication"—could manufacture incitement from almost any forceful political address, casting an unconstitutional chill over core political expression. *Counterman*, 600 U.S. at 73–76.

*Second*, "incitement by implication" has no legal or historical foundation. Plaintiffs identify no Supreme Court or federal appellate decision in the 57 years since *Brandenburg* that sustained incitement based on an allegedly unlawful command the speaker's actual words did not communicate, much less a speech by the President of the United States. Apart from a handful of erroneous trial- and state-court decisions, no identified case in the Nation's history has permitted liability based on a finding of "implicit incitement." The only other federal district court

ever to let such a theory past the pleadings was reversed on interlocutory appeal. *See Nwanguma*, 903 F.3d at 611–13. The district court's contrary ruling thus stands alone, and the utter "lack of historical precedent" to support it is a "telling indication of a severe constitutional problem" in the decision below. *Trump v. Anderson*, 601 U.S. 100, 114 (2024) (internal quotation marks omitted); *accord Hou. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022). A historically narrow First Amendment exception category cannot be expanded for one speaker only, by relabeling an allegedly unspoken command, "implicit."

To support its contrary view, the district court relied heavily on a single sentence of dicta from the out-of-circuit decision in *Bible Believers v. Wayne County*, 805 F.3d 228, 246 (6th Cir. 2015) (en banc), that incitement may reach speech that "explicitly or implicitly encouraged the use of violence." But even *Bible Believers* did not sustain an implicit-incitement finding; it rejected liability and reaffirmed that courts must "rely on an objective standard to draw the boundaries" of unprotected speech. *Id.* This Court should reverse.

### B. At Minimum, Implied Incitement Must Be the Only Reasonable Meaning of the Speech.

Even if "implicit incitement" were a cognizable category—it is not—the district court still applied the wrong standard. It held that President Trump's statements were "plausibly words of incitement" when viewed alongside allegations concerning his intent, the audience, and later events. Op. 59. But political speech cannot lose First Amendment protection merely because a plaintiff offers one allegedly unlawful interpretation. Where liability depends on implication rather than express command, incitement must be the speech's only reasonable meaning—not one among many.

That conclusion follows directly from *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449 (2007) *("WRTL")*. There, the government argued that advertisements addressing pending legislation were the functional equivalent of express electoral advocacy. *Id.* at 470. The controlling opinion rejected a test based on the speaker's intent, surrounding considerations, or competing interpretations. Instead, it held that speech could be treated as the functional equivalent of express advocacy only when it was "*susceptible of no reasonable interpretation*

*other than* as an appeal to vote for or against a specific candidate." *Id.* at 469–70 (emphasis added).

This rule reflects the First Amendment's solicitude for political expression. As *WRTL* explains, courts may not suppress speech based on "amorphous considerations of intent and effect." *Id.* at 469. Nor may they force speakers to "hedge and trim" their political messages to avoid liability. *Id.* at 495 (Scalia, J., concurring in part and in the judgment). Political debate is often forceful, imprecise, and susceptible to different understandings. The First Amendment therefore gives "the benefit of any doubt" to speakers, not to plaintiffs seeking to punish them. *Id.* at 469. Where a protected and an unprotected interpretation are both reasonable, the "tie goes to the speaker." *Id.* at 474.

These principles apply with even greater force to implicit incitement. "Functional equivalent" and "implicit" both ask a court to assign a speaker's words a meaning they do not explicitly convey. *WRTL* involved discrete categories of election advertising, *id.* at 469, but the incitement line runs through advocacy of every kind, political advocacy included, and crossing it exposes the speaker to liability for the violent acts of others. If the Constitution demands an unmistakable case before

regulating an issue ad, it demands at least as much before punishing speech at "the First Amendment's core." *Counterman*, 600 U.S. at 81; *see Brandenburg*, 395 U.S. at 447. Only an objective rule keeps courts from stripping protection based on "amorphous considerations of intent and effect," competing inferences, or hindsight. *WRTL*, 551 U.S. at 469.

The need for that safeguard is especially great in a case like this, which seeks to impose civil liability on a sitting President for urging citizens to petition Congress. That is core political advocacy by the constitutional officer vested with the "extraordinary power to speak to his fellow citizens and on their behalf." *Trump*, 603 U.S. at 629. If the advertisements in *WRTL* could not be treated as express advocacy where a reasonable lawful interpretation is possible, the Ellipse Speech cannot be converted into incitement merely because Plaintiffs offer an unlawful interpretation they claim to be plausible.

*Counterman*'s *mens rea* analysis further fortifies this conclusion. As the Court explained, the heightened specific-intent requirement for incitement provides "breathing room" for protected speech; it does not permit courts to use unexpressed intent to overcome a reasonable lawful interpretation or to supply an inciting command absent from the words

themselves. *Counterman*, 600 U.S. at 75. "Incitement by implication" inverts that rule by leveraging intent to improperly convert facially protected political advocacy into unprotected incitement, even when the words on their face are protected expression. Indeed, that inversion is especially dangerous at the pleadings stage, because it allows allegations about unexpressed intent to subject facially protected speech to years of litigation. *See Wash. Post Co.*, 365 F.2d at 968 (litigation itself is "chilling to the exercise of First Amendment freedoms").

The district court tried to avoid *Counterman* by declaring that it "is not a case about incitement." Op. 60. That is not a reason to ignore it. *Counterman* erects intent as an additional hurdle that a plaintiff must clear in order to avoid a "chilling effect" on "dissenting political speech at the First Amendment's core." 600 U.S. at 81. It does not permit intent to strip protection from speech that is not, on its face, unlawful. *Counterman*, 600 U.S. at 75–76. Incitement, the Court explained, demands the most exacting mental-state requirement because it lies "a hair's-breadth away from political 'advocacy.'" *Id.* at 81. The district court thus erred in claiming that *Counterman* "did not clarify the law about that category of unprotected speech." Op. 59; *Winslow v. FERC*, 587 F.3d

1133, 1135 (D.C. Cir. 2009) (Kavanaugh, J.) ("[C]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.") (quoting *United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006)).

The procedural posture of this case illustrates those very risks. The district court acknowledged that the Speech never explicitly encouraged violence. Op. 63. Yet the district court wrongly permitted years of litigation over alleged motives, private knowledge, and subsequent events merely because Plaintiffs wrongly posited a plausible unlawful implication—the subjective inquiry *WRTL* forbids.

Because the Ellipse Speech is reasonably—and most naturally—understood as peaceful political advocacy, the First Amendment required dismissal at the outset.

### C. The Best—Indeed, the Only Reasonable—Interpretation of the Speech Is a Call for Peaceful Political Advocacy.

Speaking from the Ellipse, President Trump called out election fraud as he saw it and urged his supporters to "peacefully and patriotically make [their] voices heard." Sp. 9. The district court nevertheless purported to find incitement in two statements near the

Speech's close: "We fight. We fight like hell," and the President's call to give "weak Republicans" the "pride and boldness" needed "to take back our country." Op. 64, 69. As a matter of ordinary meaning, and taken in context, both statements urged political pressure, not violence.

### 1. The Words the District Court Deemed Inciting Called for Political Courage, Not Violence.

Plaintiffs' theory fails because none of the words the district court identified called for the specific unlawful acts attributed to President Trump. *Brandenburg* requires speech "directed to inciting or producing imminent lawless action" and likely to produce "such action"—*i.e.*, the particular action advocated, not lawlessness in the abstract. *Brandenburg*, 395 U.S. at 447. The words must also have been "intended (not just likely) to produce imminent disorder," *Counterman*, 600 U.S. at 76 (internal quotation marks omitted), and that specific intent must correspond to the particular "lawless action" urged, *Brandenburg*, 395 U.S. at 447. Here, neither requirement is satisfied: President Trump called on the crowd to strengthen wavering Republicans, pressure Congress, and impose electoral consequences on lawmakers who refused to act by "peacefully and patriotically" making their voices heard. Sp. 7, 9, 31. He did not call on anyone to breach the Capitol, assault police, or

stop the certification by force. That mismatch between the conduct urged and the conduct alleged defeats incitement as a matter of law.

Start with the language the district court erroneously deemed inciting: President Trump urged the crowd to give "weak Republicans" the "pride and boldness" needed "to take back our country." *Thompson*, 590 F. Supp. 3d at 115. The Speech itself made clear what he meant. President Trump sought to enlist the attendees in persuading Vice President Pence and Republican members of Congress to reject certification and return the disputed electoral votes to the States. He told the audience that Pence could "send it back to the States to recertify," that the crowd would go to the Capitol to "cheer on our brave senators and congressmen and women," and that wavering Republicans needed encouragement to act. Sp. 4–5, 8–9. He distinguished those "weak" Republicans from "the strong," who already opposed certification, and Democrats, whom he called "hopeless." Sp. 31. The point was unmistakably political: strengthen wavering allies so they would cast the desired vote. Assaulting those officials would not give them "pride and boldness," persuade them to object, or cause them to return the electoral

votes. It would defeat the very political effort the Ellipse Speech asked the crowd to advance, and it was clearly not what was meant.

The adjacent "fight like hell" language carried the same political meaning. Throughout the Speech, President Trump used "fight" to describe what lawmakers, candidates, and voters do through objections, votes, elections, and primaries. He praised members of Congress because "the House guys are fighting." Sp. 6. He described Republicans as "fighting like a boxer with his hands tied behind his back." Sp. 8. He urged supporters to "get your people to fight." Sp. 7. And he prescribed the consequence for Republicans who refused: "primary the hell out of the ones that don't fight." *Id.* The Speech thus supplied its own definition of "fight." It meant opposing certification through congressional action, enacting electoral reforms, and imposing electoral consequences on lawmakers who refused. President Trump did not tell the crowd to breach the Capitol, confront police, or use force. He told supporters to embolden Republican legislators—and replace them at the ballot box if they declined to act.

This is how the term "fight" is ordinarily used in American political discourse. Political leaders routinely use combative—and even facially

threatening—language to describe political opposition, not violence. President Biden promised to "keep fighting like hell," while Representative Swalwell and Senator Schumer each declared that their party would "fight like hell." 167 Cong. Rec. S672–73, S678 (daily ed. Feb. 12, 2021). No reasonable listener would treat such rhetoric as an operational command to commit violence, especially here, where the Speech itself defined the "fight" as political opposition.

The district court's treatment of Giuliani and Trump Jr. sharpens the point. Giuliani told the same rally, "So, let's have trial by combat," and "We're going to fight to the very end to make sure that doesn't happen." *Thompson*, 590 F. Supp. 3d at 105. Trump Jr. warned Republicans who failed to support the President that "we're coming for you, and we're gonna have a good time doing it." *Id.* at 106. Both statements were more pointed than President Trump's: Giuliani invoked a specific form of confrontation, while Trump Jr. issued a direct warning to identified political opponents. Yet the district court held both protected. The same result must follow for President Trump's more diffuse and consistently political remarks. The court reached the opposite result only by importing alleged private knowledge and intent to supply

a call to violence that was absent from President Trump's words. That is the very "bizarre result" *WRTL* warned against: materially similar speech protected for one speaker but punishable for another based on an amorphous inquiry into subjective intent. 551 U.S. at 468. The First Amendment does not permit that speaker-specific double standard. This case must be dismissed.

**2. The Speech's Full Context Confirms Political Advocacy, Not Incitement.**

The Ellipse Speech was clear about what the President wanted and expected from the audience. President Trump repeatedly told them what to do, how to do it, and what political result to seek. Each instruction pointed to peaceful persuasion; none pointed to violence.

President Trump first told the crowd exactly what to do: "I know that everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard." Sp. 9. That sentence resolves the issue. The conduct was "marching." The manner was "peacefully and patriotically." The purpose was to "make your voices heard." President Trump described a political demonstration, not an attack. *See Thompson*, 590 F. Supp. 3d at 117 (conceding that the

"peacefully and patriotically" instruction is "a factor favoring the President").

The President repeated that same instruction when he returned to the march: "[W]e're going to walk down to the Capitol. [] And we're going to cheer on our brave senators, and congressmen and women." Sp. 8. The crowd was to walk, cheer supportive lawmakers, and pressure wavering ones. President Trump likewise urged the audience to "demand that Congress do the right thing." Sp. 9. Every instruction was directed toward persuasion. None was directed toward force.

Every remedy President Trump proposed throughout the speech was political. Vice President Pence should "come through for us." Sp. 8. Congress should reject the disputed electoral votes. *Id.* Republican lawmakers should find the "pride and boldness" to object. Sp. 31. Those who refused should face primary challenges. Sp. 7. Contrary to the district court's false insinuation, *Thompson*, 590 F. Supp. 3d at 66–67, the President's reference to "you're allowed to go by very different rules" was not an attempt to authorize criminal conduct. In context, President Trump was clearly arguing that alleged election fraud changed how the Vice President and Congress should handle certification. His very next

words confirm it: "So I hope Mike has the courage to do what he has to do, and I hope he doesn't listen to the RINOs and the stupid people that he's listening to." Sp. 27. The rules he invoked were the rules governing certification—not the criminal laws against trespass, assault, and destruction of property.

The Speech never instructed the crowd to do anything unlawful. President Trump told no one to cross police lines, breach the Capitol, physically assault officers or lawmakers, damage property, occupy either chamber, or stop certification by force. Plaintiffs' alleged command appears nowhere in the Speech. The command President Trump actually gave was its opposite: march "peacefully and patriotically" and "make your voices heard." Sp. 9. President Trump repeated that same peaceful instruction when he released a video from the Rose Garden urging his supporters: "We have to have peace. We have to have law and order." Op. 54–55.

The length of the march further defeats any claim of imminent incitement. The Capitol was roughly a 45-minute walk from the Ellipse. President Trump was not directing the audience to commit lawlessness then and there. It was also unclear at the time how long congressional

debate would last. Plaintiffs' wrongful theory is that he publicly told the crowd to march peacefully across Washington for nearly an hour—but secretly meant for it to attack Congress upon arrival. Nothing in the Speech supports that extraordinary, false inference.

The televised setting likewise refutes the required intent. President Trump delivered the Speech before television cameras, live to the Nation and the world. MSJ Exs. 47 (tweet showing RSBN broadcast), 113 (Bloomberg broadcast lodged with court), 151 (retweet of Fox coverage). It is implausible that he used that forum to issue a coded command for thousands of supporters to assault police officers and members of Congress in full public view. His public words conveyed precisely what he intended the audience to do: march peacefully, make its voices heard, and persuade government officials.

The Speech's closing confirmed the same point. President Trump again directed supporters to "walk down Pennsylvania Avenue," predicted that "the best is yet to come," thanked the audience, and concluded: "God bless you. And God bless America." Sp. 31. Those words cannot reasonably be understood as a command to commit violence. The opposite is true—they were a call for peace and patriotism. Plaintiffs and

the district court can reach the wrongful conclusion only by disregarding what President Trump said and improperly substituting an unstated—and opposite—message of their own. This Court should reverse.

#### 3. The District Court's Extrinsic Evidence Does Not—and Cannot—Transform Protected Advocacy into Incitement.

The district court could not find a call to violence in the Speech. So it erroneously tried to manufacture one by weaving together the President's prior statements about election fraud over the preceding months, unfounded speculation about what the President "would have known" about his January 6 audience, and Cassidy Hutchinson's false account of private remarks allegedly made before the Speech ever began. Op. 63–64, 66–67. None of it satisfies *Brandenburg*'s requirement that the speech *itself* be directed to producing imminent lawless action.

The district court erred by relying on the "broader context" of "distrust and anger." *Thompson*, 590 F. Supp. 3d at 115. Many consequential political speeches in American history have that backdrop; that is often why such a speech is given. Nearly every mass political movement has suffered isolated incidents of violence at its margins. Further, political rhetoric has long accused one segment of society of

"looting," "stealing," and "robbing" another. Under the district court's flawed approach, combining those ordinary features of political life transforms an invitation to join a rally into an implicit "call to action." *Id.* That is error.

Nor could the district court rely on the President's alleged knowledge of violence in wholly different contexts. Op. 63–64. The court leaned on false allegations that the President and his advisers were aware of websites on which anonymous users called for violence. *Thompson*, 590 F. Supp. 3d at 115–16. But speculative awareness that strangers on the internet post violent things is not a distinguishing feature of January 6. Online forums are filled with anonymous calls to violence across the political spectrum and on every conceivable issue. If knowledge that such posts exist supplies the intent element of incitement, then every public official who speaks to a large crowd in a polarized era speaks at peril of legal exposure.

In any event, those farfetched allegations permit at most the inference that violence was a foreseeable risk—not that the President intended to produce it. The court itself acknowledged that mere recklessness, or "ignoring a known substantial risk," is "not enough." Op.

65. It then erroneously inferred intent anyway, because President Trump allegedly "would have known that some in the audience were prepared for violence," based on his supposed monitoring of unrest and militia rhetoric in other settings. Op. 63–64. That is precisely the inference *Counterman* forbids. Incitement requires "purpose or knowledge," 600 U.S. at 81—not supposed awareness that violence might occur. Knowing of general unrest does not establish that the speaker wanted violence, knew his words would produce it, or directed his words toward that end.

The district court erred further in relying on third-party statements. It placed great weight on a former aide's prediction that "there will be violence on January 6th." Op. 63–64. But incitement is measured by the speaker's own words and purpose, not by a former aide's punditry. On the district court's incorrect view, a speaker can be made an inciter by other people—if they predict loudly enough that a speech will cause a riot.

The district court then relied on Hutchinson's false account of private remarks allegedly made before President Trump took the stage. Op. 66–67. That reliance fails at the threshold. The court itself acknowledged that her testimony was "outside the four corners of the

complaints." *Id.* at 66 n.27. Acknowledging the defect did not cure it. A court may not rescue deficient complaints with unpleaded testimony on the theory that Plaintiffs might someday amend to include it.

The testimony proves nothing in any event. Hutchinson falsely claimed that President Trump objected that magnetometers were keeping supporters out of the rally and said, "They're not here to hurt me." Op. 66. Those alleged remarks were private, were never communicated to the crowd, and concerned whether attendees posed a threat to the President—not whether he wanted anyone to attack Congress. *Brandenburg* requires advocacy "directed to inciting or producing imminent lawless action." 395 U.S. at 447. Hutchinson identified no such advocacy.

The district court nevertheless treated Hutchinson's account, "if assumed true," as showing "at a minimum" that the President knew some supporters had weapons and that those weapons "might be used to cause harm." Op. 66–67. In addition to the fact that Hutchinson's account is highly dubious, the inference the district court drew simply does not follow. Guessing that some attendees are armed is not knowledge that anyone will use a weapon, and it is farther still from proof that the

speaker wants one used. In a country where lawful carry is common and constitutionally sacrosanct, some attendees may be armed at essentially every large rally in America.

Nor was there any basis for the district court's conclusion that Hutchinson's account "corroborated" the allegation that the President knew rally attendees were prepared to engage in imminent violence. Op. 67. To get there, the court eagerly read "they're not here to hurt me" to mean "but they are here to hurt someone else." That reading makes no sense in context. The subject under discussion was magnetometers keeping supporters out of the rally, and the President was complaining about crowd size. The natural reading is the obvious one: these are my people, they are harmless, let them in. Nothing in those remarks implies that President Trump knew they would harm others, or that the President incited others to do so, none of which is the case here.

The firearms evidence further undercuts the district court's premise. Federal prosecutors reported that "few defendants … possessed a firearm," and that there was only one protestor who discharged a weapon "into the air" outside the Capitol. *United States v. Banuelos*, No. 24-cr-135 (D.D.C.), ECF No. 21, at 15. Nothing in the Speech told anyone

to brandish or fire a weapon. President Trump's public instruction remained to march "peacefully and patriotically" and "make your voices heard." Sp. 9. He cannot be held liable for unlawful acts that followed but that his words neither urged nor authorized. See *Brandenburg*, 395 U.S. at 447; *Claiborne Hardware*, 458 U.S. at 929.

* * *

The district court's ruling violated both presidential immunity and the First Amendment. A President must be able to know, when he acts, whether he is immune, as President Trump is here. A speaker must know, when he speaks, whether his words are constitutionally protected, as President Trump's Speech is here. Neither protection can turn on facts unknown at the time, the private acts of others, later events, or after-the-fact discovery. *Trump v. United States* demands *ex ante* certainty for immunity; *Brandenburg* demands it for speech. President Trump's Ellipse Speech did not cross the constitutional line when he delivered it, and far-flung "context" cannot drag it across years later.

The continued litigation of this case poses a threat to the presidency and the constitutional order. It subjects the sitting President to years of litigation for core official speech, it chills future Presidents from speaking

forcefully on matters of national concern, and it risks turning democratic advocacy into liability through hindsight. This case should end now.

## CONCLUSION

For all these reasons, the Court should reverse.

Date: September 1, 2026

Respectfully submitted,

/s/ Joshua Halpern
Joshua Halpern
Circuit Bar No. 67352
**JH Legal PLLC**
1100 H Street, NW, Suite 840
Washington, D.C. 20005
Telephone: (610) 405-5531
jhalpern@jhlegalpllc.com

Caryn G. Schechtman
Circuit Bar No. 67233
M. David Josefovits
Circuit Bar No. 67354
Aaron C. Ward
Circuit Bar No. 67170
**DLA PIPER LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, New York 10020-1104
Telephone: (212) 335-4500
caryn.schechtman@us.dlapiper.com

Jonathan M. Shaw
Circuit Bar No. 56548
**Dhillon Law Group, Inc.**
2121 Eisenhower Ave, Suite 608

Alexandria, Virginia 22314
Telephone: (703) 574-1206
jshaw@dhillonlaw.com

Jesse R. Binnall
Circuit Bar No. 62429
Gerald A. Urbanek, Jr.
(Member Application Pending)
**Binnall Law Group PLLC**
717 King Street, Suite 200
Alexandria, Virginia 22314
Telephone: (703) 888-1943
jesse@binnall.com

*Counsel for Defendant-Appellant*
*President Donald J. Trump*

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this document complies with Circuit Rule 28(c), with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7) and Circuit Rule 32(e), and with this Court's order of August 7, 2026 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 15,948 words.

Undersigned counsel certifies that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: September 1, 2026

Respectfully submitted,

/s/ *Joshua Halpern*
Joshua Halpern

*Counsel for Defendant-Appellant*
*President Donald J. Trump*

## CERTIFICATE OF SERVICE

I certify that on September 1, 2026, a copy of this document was filed with the Clerk of the Court, which will automatically generate and serve Notices of Electronic Filing on all entitled.

/s/ *Joshua Halpern*
Joshua Halpern

*Counsel for Defendant-Appellant*
*President Donald J. Trump*